APPENZELLER *v.* APPENZELLER.

FRAUD—DEEDS—EXECUTION.

Evidence *held*, to be insufficient to sustain the burden of proof resting on complainant, who claimed that her son and his attorney had procured the execution of a deed of her property by fraud.

Appeal from Saginaw; Gage, J. Submitted April 21, 1913. (Docket No. 97.) Decided October 1, 1913.

Bill by Leah Appenzeller against William H. Appenzeller and wife for the cancellation of certain deeds. From a decree for defendants, complainant appeals. Affirmed.

*Riley L. Crane,* for complainant.

*Snow & Snow,* for defendants.

KUHN, J. In this proceeding it is sought to set aside a deed given by complainant to the defendant William H. Appenzeller and his two sisters. The

father, Frederick Appenzeller, died in Saginaw on September 29, 1909. He had been in the mercantile business in different places, and the property covered by the deed in question, of the value of about $50,000, was the result of the earnings and savings of himself and his wife. The title of the property had been taken in the wife's name for reasons not disclosed by the record. The defendant William H. Appenzeller, at the time of the death of his father, was residing in the city of Seattle, Wash., where he was engaged in the shoe business. The father being stricken with paralysis, the son was summoned by telegram and arrived in Saginaw about a month before his father's death and remained until about a week after and then returned to Seattle to dispose and arrange his property matters so that he could come back to Saginaw to remain permanently. It is his claim that after his father's death he talked over the property matters with his mother, and that she suggested that he look after the collection of the rents, and that she was desirous of placing the property in her children's names. He thereupon consulted an attorney, who advised him that a deed might be drawn to the three children reserving a life estate to the mother. He claims to have informed his mother of this, but she objected to the attorney who had been suggested and proposed that he see Mr. Frank Emerick, an attorney who had done some business for the father during his lifetime, and request him to draw the deed. This was done and a deed was prepared, and on the evening of October 11, 1909, by arrangement, Mr. Emerick took the deed to the home of complainant and in the presence of her daughter Daisy, her son, the defendant William, and the attorney, Mr. Emerick, she executed a deed by which she deeded practically all the property to the three children, reserving to herself a life estate "for and during her natural life, together with the possession and

control thereof and all the rents, issues, and profits thereof."

The testimony of the complainant and her daughter Daisy is in sharp conflict with the testimony of the son and Mr. Emerick as to what occurred at the house. It is the claim of complainant that as her other daughter, Lulu, was very ill at Lake Geneva, Wis., they were making preparations to leave Saginaw on the morning of the 12th of October to visit that daughter, and they did leave on that day and were accompanied by her son, who went on to Seattle after remaining a day or two at Lake Geneva. She claims that the first she heard about Mr. Emerick coming to the house was when her son on the evening before leaving at about 7 o'clock, came to the kitchen where she and her daughter were washing dishes and said, "Hurry up, Mr. Emerick is coming up this evening to see about collecting the rents while we are away;" that when Mr. Emerick arrived there was no talk of a deed or transfer of property; and the type-written deed was folded and only party opened, and that it was not read to her, and that she supposed that she was signing a paper with reference to the rents only. She testified:

"He came in at 8 o'clock and he had a paper in his pocket, and he was pretty much in a hurry, and he said, 'Mrs. Appenzeller, I want you to put your name down on this paper; sign it.' He read a little but not very much of it. He said, 'Each child should share and share alike.' So I thought it was the rents, nothing but a lease; and that was all he read; and he says, 'Now it isn't necessary to read anything else.' He said: 'It is all right, Mrs. Appenzeller. Put your name right down here.' He never asked me to read it at all, and I didn't think there was anything else only— * * *

"Q. Then your understanding of this paper was that he was to collect the rents on your husband's estate and give them equally to the three children?

"*A.* No, my share would come out of that.

"*Q.* Well, I thought you said Mr. Emerick told you it was to deed it to your three children, share and share alike?

"*A.* Share and share alike, he fixed this.

"*Q.* I say, that is what you say you have understood that the rents were to go to the children, share and share alike? You thought he meant rent from the estate of your husband, is that right?

"*A.* Rents from the estate.

"*Q.* Well, now, you said that he read a portion of it to you?

"*A.* Yes, sir. He told me share and share alike. When he said share and share alike, I thought he meant the children, of course. I have done considerable business during my lifetime and understand it. I have seen deeds of property and signed many of them. I have sold property of my own and signed deeds for it."

In this she was corroborated by her daughter Daisy. The defendant testified to an entirely different version of the transaction, and said that his mother fully understood the arrangement for deeding the property before Mr. Emerick arrived, and the deed was read to her, and that an hour was spent in discussing and explaining its details.

Mr. Emerick testified as follows:

"*Q.* How did you happen to draw that deed, Mr. Emerick?

"*A.* Mr. Wm. Appenzeller came to the office and informed me that there had been some family conferences in regard to the disposition of the property or arrangement of the property; that he consulted Mr. W. E. Crane, and his mother objected to him and desired to have her own attorney, which was myself, to prepare this deed and look after the business; and he said to me, after conferring together, 'She desired to have the conveyance in such shape as to retain the property during her life, and after her death to be divided among the children.' I drew the deed in accordance with those instructions and suggestions.

"*Q.* Will you state to the court what took place at the time this deed was signed by Mrs. Appenzeller?

"*A.* Well, after preparing the deed, I took it to my residence on Michigan avenue about a couple of blocks, I think, from where they resided, and then in the evening I walked down there, and when I came to the house the three were in the sitting room. We all sat about the table in the sitting room; and I remember I introduced the subject and took the deed from my pocket, and there was some conversation before the pen and ink was procured, and I read the paper over carefully and I explained it repeatedly to Mrs. Appenzeller, in the presence of her daughter and her son, that the paper was drawn so as to carefully protect her life estate and her property interests in the property during her life, and all the income, and so forth, and then at her death to be equally divided among the three children. I was very careful about the matter, I remember, and finally after reading this paper, and after the discussion about it and the explanation of it, it was signed and I took the acknowledgment of Mrs. Appenzeller and signed it also as a witness. The deed was signed upon the table in the sitting room and I put it in my pocket. Then there was quite a little talk about the matters pertaining to the administration of the estate; and the young lady went out somewhere from the room and brought back a box containing papers, and I stepped around on the other side of the table, and when I saw what they were I examined some of the papers, spoke about the probate of the will or whether there was or not a will. Then I think I stated to the son, who apparently had charge of matters, to fix a time he could bring all these papers to my office and I would go through them carefully and see what there was to it. It was arranged that I should take charge of the legal part of the administration of the estate, and there was some other talk about the work here. The paper was spread out at large upon the table, read over, and signed by her. From the fact it was a woman, and it has been my invariable custom to be careful about that, I will say that was my purpose.

"*Q.* At that time, was there anything said about collecting rents?

"*A.* Nothing about that subject that I can recollect at all. Nothing said about my collecting rents.

There was some talk about the estate matters and of probably finding a will."

On cross-examination:

"I have been a lawyer for 30 years. Did some business for Mr. Appenzeller, deceased. He was in the habit of coming to my office at times in consultation in regard to his various properties; sometimes had trouble with his tenants; and I prepared some leases for him. One piece of property he had on Genesee avenue of which I had an abstract made and examined the title. He was in the habit of coming to my office quite frequently. I knew Mrs. Appenzeller quite well. I once bought a piece of property from them and she came to my office some two years ago. A short time after his death, I think before the parties went West, I think some of the papers pertaining to the estate were left at my office, or brought there, before they went away. I was employed as attorney for the estate within ten days after his death and before they went West. I talked with Mrs. Appenzeller about acting for the estate prior to their going West. I think it was the same day, that evening after the execution of the deed. We examined the papers that night. We were looking for the will that night among those old papers. The first business I had done for the son here was in this case appearing as his solicitor. The son gave me the information. I didn't see any one else about the deed prior to going to the house.

"Q. And you hadn't done any business for her?

"A. Well, I don't know as I did as her attorney. I did for her husband. For several years before his death and during his sickness and after his death, I was attorney for the family. If she had occasion to consult any one she consulted me following her husband's sickness and death. The description of the property in the deed was from papers that the son brought to my office. The deed included all her property. It was the intention to include everything. I went to her house about 7:30. She, her daughter and son, and myself were the only persons there.

"Q. You say you read that deed over to her?

"A. Surely, I read it all. I read some portions more than once and the entire paper carefully once.

"*Q.* So the daughter and widow are entirely mistaken when they say that paper was not read?

"*A.* Entirely mistaken. I am absolutely sure. I wouldn't have a woman sign a paper without carefully reading it.

"*Q.* What did she say to you about it?

"*A.* I couldn't assume to give the exact language, but I know I went in and sat down and took the deed from my pocket. Mrs. Appenzeller sat near me, the daughter across the table, and the son near by somewhere; and after some ordinary conversation I produced this deed and laid it upon the table, and I called attention to it and said it was a deed I had drawn according to the information I had and what I thought she wanted, and I read the paper. Then I carefully explained the legal effect and nature of the instrument, particularly as to her retention of the life estate during her life, and the right to the reception by her of all rents and incomes during her life, and after her death to go to the three children.

"*Q.* You don't remember anything that she said about it?

"*A.* Well, I wouldn't attempt to quote her exact language. I know she made the response there when I spoke to her and that she was satisfied.

"*Q.* Wouldn't it strike you as a little peculiar that a woman deeding away all the property she owned, that she didn't say something about it?

"*A.* Why, she did say something. She talked. I couldn't repeat the exact words she used. It seemed to be perfectly understood and she signed it readily. I saw nothing peculiar in the transaction in her deeding the property to her own children and reserving a life estate. I thought it was a very equitable adjustment of her property rights. I couldn't think of anything possibly better for her. I had the paper all ready for her signature when I went there.

"*Q.* Was there anything said there about your collecting rents for her or for the estate?

"*A.* I can't recall a single word on that subject. I think the rent matter came up after she came back. The first I recall about the rent matter was trouble with a tenant in one of the stores. I never collected rents except where there was trouble. I wouldn't bother with it. She collected her own rents."

It also appears that about a year after the execution of this deed the complainant executed a will drawn by Mr. Emerick, by which she gave to her two daughters all such property as she still possessed, and especially referred to the deed in the following language:

"My son, William H. Appenzeller has already received by virtue of a deed executed by me and recorded in the register's office of Saginaw county, Michigan, an undivided one-third of my real estate described in said deed and such interest taken by him under said deed shall be in full of his distributive share and of all share of my estate."

With reference to the reason for drawing this will, there is again a decided conflict in the evidence. The complainant alleges that the will was drawn at the suggestion of Mr. Emerick and testified:

"Q. You knew what this will contained, didn't you? There was no mistake about that in your mind?

"A. Well, wasn't so much my knowledge. I never made a will before.

"Q. Well, you understood what this contained?

"A. Yes, sir.

"Q. This was read to you?

"A. Yes, the will was read to me. I knew what was in it.

"Q. So you knew when this clause, 'My son, William Appenzeller has already received by virtue of a deed, executed by me, and recorded in the register of deed's office, Saginaw county, Michigan, an undivided one-third of my real estate, described in said deed, and such interest taken by him in such deed, shall be in full of his distributive share, and of all share in my estate'—when that was read to you, you knew you had deeded to him some property, didn't you?

"A. No, sir; I didn't.

"Q. You didn't know that? What did you think that meant, those words in clause 3 of the will?

"A. I didn't know what it meant.

"Q. Why, Mrs. Appenzeller, the reason that you divided this property, all you might have, which consisted of real and personal property, jewelry, etc.,

when you devised that to your two daughters you knew that you had disposed of the rest of your property to your three children, didn't you, equally, share and share alike, and you said so right in that will?

"*A.* Mr. Emerick proposed that himself.

"*Q.* Do you mean to tell this court that when you signed that will, recognizing that deed, you didn't know then that you had executed the deed to your three children?

"*A.* No, I didn't know that I deeded it at all.

"*Q.* Well, what did you think that clause 3 meant?

"*A.* Didn't know what it meant.

"*Q.* What did you think it meant then?

"*A.* I don't know.

"*Q.* Didn't you think about it?

"*A.* I don't know."

Complainant further claims that she made frequent inquiries of Mr. Emerick concerning the instrument executed at her home but that he refused to give her the information she wanted and that it was not until her brother, who did not reside in Saginaw, came that she discovered that the instrument executed on October 11, 1909, was in fact a deed, and immediately thereafter this proceeding was instituted. It further appears that Mr. Emerick never attempted to collect any rents except in one or two instances when he collected some small sums on account of difficulties which she had with her tenants, and this was after her return from Lake Geneva, where it appears she only expected to remain two or three weeks. It does not appear that Mr. Emerick had ever acted as attorney for William Appenzeller before the drawing of the deed, and there is nothing in the record to indicate that William Appenzeller knew anything about the execution of the will until this suit was begun and Mr. Emerick informed him about it. To sustain complainant's contention in this case, it would be necessary to find that Mr. Emerick was guilty of most reprehensible conduct as an attorney and that he entered into a conspiracy with the

defendant William Appenzeller deliberately to deceive the complainant as to the character of the instrument executed on October 11th and, to carry out the fraud, had her execute the will and deliberately deceived her as to its contents. The proofs are not sufficient to warrant such a finding. It appears that he has been a practicing attorney for 30 years, had been prosecuting attorney of his county, and at the time of the hearing of the case was vice president of the board of education of the city of Saginaw.

The trial judge, who saw and heard the witnesses on the stand, made the following findings as to the credibility of the witnesses:

"From the entire evidence I cannot say that Mr. Emerick and the defendant are not quite as worthy of credence in this matter as the mother and the daughter. If it occurred as the mother and daughter claim it did, then the defendant and Mr. Emerick were parties to a conspiracy to procure this deed from the complainant by fraud and deceit. To establish a case of fraud the proofs must be clear and convincing as our court has said many times. Certainly no one who heard this evidence could say that any fraud or deceit was established by such proof."

A careful reading of this record convinces us that the proofs were wholly inadequate to make out the fraud relied upon, and the chancellor properly dismissed the bill.

The decree of the lower court is affirmed, with costs.

Steere, C. J., and Moore, McAlvay, Brooke, Stone, Ostrander, and Bird, JJ., concurred.