# OCTOBER TERM, 1915.

WEIR *v.* UNION TRUST CO.

1. TRUSTS—CONTRACTS—FRAUDULENT ACTS.

Evidence claimed by complainant to prove fraudulent conduct between decedent and defendant trust company to enable the latter to evade trust obligations and take in its name property of complainant in its hands in trust under an oral arrangement, *held*, to be insufficient to support the averments of fraudulent conduct as to either defendant or the deceased.

2. SAME—EVIDENCE.

Fraud is not to be lightly presumed, but there must be substantial evidence to establish it.

3. SAME—FORECLOSURE.

*Held*, also, that the price obtained for the property mortgaged was not so excessively low as to indicate fraud or collusion, and that the holder and purchaser bought in good faith for an adequate consideration.

4. SAME—CONSTRUCTIVE TRUSTS.

Where decedent appeared from the testimony to have interested himself in the affairs of complainant from disinterested motives and at her instance and desire, to help her save a valuable equity in heavily incumbered property, and had no expectation of compensation or reward for his services, and the relation between complainant and decedent was friendly in his lifetime and he would not have claimed or withheld any part of the amount finally realized by the sale of the property, the trial court was justified in finding that the excess of proceeds above costs, expenses, etc., realized by a sale of the incumbered realty by the trust company which had bid it in, should be impressed with a constructive trust in her favor under an agreement between decedent and defendant trust company that it should make advances needed to bid in the property in its name, and to hold the property for decedent.

(452)

5. SAME—EQUITY.

 Fraud is not necessary to give rise to a constructive trust, but if circumstances are such as to render it inequitable for the holder of the legal title to retain the same, the court may charge it with a trust in favor of the equitable owner. Implied trusts arise by operation of law as contradistinguished from those that arise from agreements of the parties, and are raised by law for the purpose of carrying out the presumed intent of the parties, or without regard to such intention for the purpose of asserting equitable rights or frustrating fraud. This form of trust is practically unlimited in extent and is employed whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice.

6. SAME—INTEREST.

 It is further *held* that the trustee under such implied trust should be charged with such interest on the sums in its hands as they may have earned during the time it held said money or proceeds.

Appeal from Wayne; Van Zile, J. Submitted June 16, 1915. (Docket No. 53.) Decided October 12, 1915.

Bill by Catherine B. Weir against the Union Trust Company and others for the enforcement of a trust. From a decree for complainant, both parties appeal. Modified and affirmed.

*Fritz L. Radford* (*Geer, Williams, Martin & Butler* and *Thomas A. E. Weadock,* of counsel), for complainant.

*Angell, Bodman & Turner*, for appellant Union Trust Co.

*Campbell, Bulkley & Ledyard* (*Henry Ledyard,* of counsel), for appellees Union Trust Co. and Fred M. Alger.

*Miller, Smith, Canfield, Paddock & Perry,* for defendant Country Club and subsequent purchasers.

KUHN, J.   The complainant inherited the property
here involved, known as the "Weir farm," situate in
Grosse Pointe, Wayne county, in this State, and also
certain property designated in the record from time to
time as the "city property," situated in the city of
Detroit, from her parents.   The Weir farm is now
owned by the Country Club of the City of Detroit, and
used by that club for golf links, excepting certain lots
which have been sold by the club to purchasers who
are made defendants herein.   The farm property was
managed by the husband of the complainant during
his lifetime, but he died December 3, 1886.   It is al-
leged by complainant that after the death of her hus-
band the property became unproductive, and, as she
was in need of means for her support and to pay cer-
tain debts which she had incurred, she borrowed money
from time to time and gave mortgages on the prop-
erty.   Her custom when she needed money was to give
a new mortgage and pay the mortgage then on the
property with the proceeds of the new obligation.   In
1900 she borrowed $18,000 from one William Cottrell,
of Mt. Clemens, Mich., and gave a mortgage for that
amount on her city property, and in 1901 she bor-
rowed from him $47,862, and gave him a mortgage
covering both her farm and the city property.   In the
same year she gave Ernest C. Miller, who had been her
business agent, a mortgage for $2,200 on her farm, and
a chattel mortgage for a like amount.   This mortgage
was assigned October 9, 1901, to William G. Smith,
who was a confidential employee of Joseph H. Berry
in his lifetime.   In the same year Mr. Cottrell began
foreclosure of the $18,000 mortgage on the city prop-
erty.

Her financial matters having become involved and
embarrassing to her, early in 1902, needing advice and
financial assistance, Mrs. Weir applied for assistance
to the late Dexter M. Ferry, and Mr. Ferry referred

her to the Union Trust Company, which company examined and put a value upon her property, and learned the amount of her indebtedness. It is Mrs. Weir's claim that she made an oral arrangement with the trust company by which the company was to take charge of her property in trust for her; that she was referred by the trust company to Mr. Joseph H. Berry, who was a man prominent in the business affairs of Detroit and resided at Grosse Pointe, and consulted with him. Mr. Berry was doing business with the trust company at the time. The trust company denies that it ever accepted the property in trust. It appears, however, that Mr. Berry and the Union Trust Company took charge of her affairs, and on August 19, 1902, the trust company purchased the city property at the foreclosure sale under the first Cottrell mortgage, and advanced the purchase price, and took the circuit court commissioner's deed in its own name, which advancement was guaranteed by Mr. Berry to the trust company. On September 14, 1902, an agreement was entered into between Mr. Berry and the trust company, which was dated and signed as of August 8th. It was in terms as follows:

"An agreement, entered into on the 8th day of August, A. D. 1902, between Joseph H. Berry, of Detroit, Michigan, and the Union Trust Company, a corporation, of the same place, witnesseth:

"Whereas, said party of the first part has secured and desires to secure from said party of the second part, certain advances of money to be used in the paying of debts of and claims against Catherine B. Weir, of Detroit, Michigan, and in acquiring title to certain real estate owned by said Catherine B. Weir, upon the sale of said real estate, under foreclosure proceedings or execution sales:

"Now, therefore, said party of the first part, in consideration of said advances, which he has and which he may receive from said party of the second part, does hereby agree to repay and reimburse the said

party of the second part for all of its advances to him which have already been made or which may hereafter be made, for the purposes above stated, in two (2) years from the date hereof, with interest on all sums so advanced at the rate of five per cent. (5%) per annum, payable semi-annually; and said party of the second part does hereby agree upon the written request of said party of the first part so to do, to make advances of money to said party of the first part, as above provided, and also to bid in, in its name or otherwise, upon the written request of said party of the first part, the real estate of said Catherine B. Weir, under foreclosure proceedings or execution sales, and to hold for said party of the first part any property purchased in its name, and to attend to the application of its advances to the payment of the debts of and claims against said Catherine B. Weir, under the advice and direction of Russel & Campbell, its counsel.

"It is expressly understood and agreed by the parties hereto that said party of the second part shall receive two hundred and fifty dollars ($250.00) per annum as its compensation for performing its duties hereunder. The fees of said counsel of said party of the second part, together with its costs and disbursements, shall be paid by the said party of the first part, and shall be regarded by the parties hereto as advances made to said party of the first part by said party of the second part, under this agreement.

"In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

"JOSEPH H. BERRY [L. S.]

"UNION TRUST COMPANY [L. S.]

"By ELLWOOD HANCE, Secretary."

We find that Mrs. Weir was appreciative of what Mr. Berry was doing for her, as in August, 1902, she wrote him a letter in which she thanked him for taking care of her city mortgage and urged him to get the rate of interest reduced, which was accomplished by Mr. Berry in due time by arranging to have the trust company carry the mortgage on the city property and reduce the rate of interest from 7 to 5 per cent. From time to time the trust company paid out money either

direct to Mrs. Weir or to her creditors, and for taxes of various kinds upon her real estate, which advancements were always approved by Mr. Berry. These advancements would be made by Mrs. Weir's requesting Mr. Berry to authorize the payment by the trust company of the account or accounts in question.

In March, 1903, the Cottrell mortgage of $47,862 fell due, and interest was in arrears. Mrs. Weir being without funds, and in order to avoid a foreclosure, it was arranged with Mr. Cottrell that the mortgage be extended until March 14, 1908, the interest reduced from 7 to 5 per cent. upon payment to Cottrell of the sum of $6,700. This amount was paid by the trust company and charged to the account of Mr. Berry, who then insisted on further security for himself. A mortgage was prepared by Mr. Boynton, his attorney, which, after being examined by Mr. Corbett, attorney for Mrs. Weir, was signed by her March 17, 1903. At this time she knew of the agreement of August 8, 1902, between Mr. Berry and the trust company. About January 23, 1903, Mrs. Weir was sent a statement of all the advances made by Joseph Berry through the trust company, and from that time until the death of Mr. Berry, in 1907, quarterly statements were sent to both Mrs. Weir and Mr. Berry showing in detail the advancements made throughout the quarter, and were under the caption "Union Trust Company, Account of Joseph H. Berry—Re Catherine B. Weir." In August, 1904, the Berry-Trust Company agreement expired, and as Mrs. Weir had not sold her property, it was renewed for two years. In August, 1906, the same situation prevailed, and the agreement was again renewed until March, 1908, when the Cottrell mortgage as extended fell due. Mrs. Weir was sent copies of these extensions. In August, 1906, the advances through the trust company had risen to over $40,000, and directly by Mr. Berry to $4,158, and Mr. Boynton

suggested that a further mortgage be given by Mrs. Weir to Mr. Berry for his security. Such a mortgage was prepared by Mr. Boynton and executed by Mrs. Weir in the offices of the trust company on September 22d in the presence of Mr. George F. Monaghan, representing Mrs. Weir as her attorney.

Matters continued as before until the death of Mr. Berry, in May, 1907, and the trust company, claiming that it was not warranted in making further advances, stopped doing so. The officers of the trust company, as administrators of the estate of Mr. Berry, urged Mrs. Weir to sell her property, but this she did not do, and in March, 1908, the executor of the estate of Mr. Cottrell began foreclosure of the $47,862 mortgage, claiming it to be a first lien on both the city and farm property, and in April, 1908, the Union Trust Company, as administrator of the estate of Joseph H. Berry, began foreclosure of the mortgages of 1903 and 1906 given by Mrs. Weir to Mr. Berry on the farm. At the same time, the trust company filed another bill to foreclose its equitable mortgage on the city property represented by the deed from the circuit court commissioner given to it after the foreclosure of the first Cottrell mortgage of 1900, but did not go to a decree, and was later discontinued. Mrs. Weir was served with process in each case, and appeared by her solicitor. The Berry estate and Cottrell foreclosures proceeded to decree, and the court found that there was due the executor of the Cottrell estate the sum of $53,-376.31, and that there was due the administrator of the Berry estate the sum of $56,312.08, and that the farm should be sold subject to the superior lien of the Cottrell mortgage.

Pursuant to the decree, the property was sold on September 10, 1909. It was first sold under the decree in the suit brought by Berry's administrator, and was bid in subject to the Cottrell mortgage for $55,000.

The property was then sold under the decree taken in foreclosure by Cottrell's executor, and was bid in by the Union Trust Company in its individual capacity, upon advice of counsel for the estate of Berry, for the amount due at the time, $54,140.11, and the amount was charged to the estate of Berry and allowed in its account to the probate court. The time of redemption under these sales expired March 10, 1910, and, although Mrs. Weir was urged by the officers of the Berry administrator to redeem and save any equity there might be, she allowed the time to elapse without doing so. The Berry administrator then endeavored to find a purchaser for the property.

An option was given to Mr. F. T. Moran to buy the Weir farm at a minimum of $150 per front foot for 30 days, which was extended 30 days and allowed to lapse. In October, 1910, Mr. Frederick M. Alger, then president of the Country Club, sought to buy the property. By permission of the probate court, the administrator of the Berry estate entered into a contract to sell the land to him for $165,000, or about $128 per front foot. The sale was carried through, and Mr. Alger took a quitclaim deed from the trust company, which held the bare legal title under the purchase at the Cottrell foreclosure sale, and a conveyance with limited covenants of warranty from the administrator of the estate of Berry. Mr. Alger at once conveyed to the Country Club for a nominal consideration, and at his own expense furnished title insurance rather than give a warranty deed when he himself had not received such a deed. Mrs. Weir, in the spring of 1911, went to the trust company and told its officers that she did not think the deed to Mr. Alger was worth the paper it was written on, and on September 10, 1912, she gave written notice to the trust company, and also to the Country Club, that the conveyance to Mr. Alger was a fraud and a violation of her rights. On May

24, 1913, the bill of complaint in this case was filed. The bill makes general and specific charges of fraud, and prays to have impressed upon the title to this farm, acquired by the Union Trust Company, a constructive trust for her benefit, and to have this trust follow the title to this property into the hands of the Country Club and the other defendants who now hold it; for an accounting by the Union Trust Company, both individually and as administrator, for the purpose of determining the amount of her indebtedness to them and advances of money made by them for her benefit; and for the restoration of her title to the Weir farm upon redemption thereof by her paying such indebtedness; and also for alternative relief.

The learned circuit judge who heard the case below dismissed the bill as to all the defendants but the administrator of the Berry estate, and held that the funds in its hands paid by the Country Club, to wit, $165,000, were impressed with a constructive trust, and that the Union Trust Company, who had notice of the situation and the facts, was bound as the administrator of Berry's estate to carry out that trust. Both complainant and the trust company as administrator have appealed.

It is the theory of the complainant's bill that the Union Trust Company entered into an agreement with Mrs. Weir in the summer of 1902, whereby it took all her property in trust to manage it, preserve, and sell it for her, and that the Berry-Trust Company agreement of August 8, 1902, was not made in good faith, but was merely a sham under which the trust company could evade its fiduciary duties to her.

After a very careful review of this record, we are unable to find that this contention of complainant is sustained by the proofs. The circuit judge found—and we are in entire accord with his finding—that from the time Mrs. Weir first came to the trust company

and was referred to Mr. Joseph Berry, and from the time Mr. Berry took the superintendency of her business through the trust company, the business was conducted with zealous care upon the part of both the trust company and Mr. Berry. Space forbids reviewing the testimony with reference to the communications between Mrs. Weir and the trust company which show that she must have known the true relation between the company and Mr. Berry, and which show beyond controversy that the trust company had no trust relation whatever with complainant, but that it was Mr. Berry to whom she looked for advice and assistance. Beginning January 24, 1903, and every three months thereafter through the entire period involved in this suit, the trust company sent Mrs. Weir and Mr. Berry duplicate statements showing in detail receipts and disbursements for the period covered, and carrying forward the balance from the preceding quarters, all of which statements were under the caption set forth above in the statement of facts. Indeed, it is quite significant in this connection that, instead of relying upon the trust company whenever an important step was taken with relation to her affairs, she secured her own separate and independent counsel, and was guided by them.

It is elementary that fraud is not lightly to be presumed, but there must be substantial evidence to prove it. Recent reiteration of this principle is found in the following cases, where previous decisions of this court are cited: *Donnelly* v. *Lyons,* 173 Mich. 515 (139 N. W. 246) ; *Island Mill Lumber Co.* v. *City of Alpena,* 176 Mich. 575 (142 N. W. 770) ; *Appenzeller* v. *Appenzeller,* 177 Mich. 303 (143 N. W. 70). Complainant has completely failed to show any fraud or unfair dealing on the part of the trust company.

There also cannot be any question on this record of the good faith and fair dealing of Mr. Frederick M.

Alger, who purchased the property from the administrator, and also that the Country Club purchased the farm without notice, either constructive or actual, of any outstanding equities thereon in favor of Mrs. Weir.

We are also satisfied that the consideration paid for the property, approved by the probate court, was a fair price for the property at the time the sale was made. It is true that property along the lake shore, because of its limited extent, has had a great rise in value; but we are satisfied that the property was not sold for such an inadequate consideration that the purchaser should not be deemed a *bonà fide* purchaser. Mr. Alger, who made no profit out of the deal whatsoever, had the title examined by competent title examiners, and in good faith relied upon the opinion of reputable counsel as to the title of the property purchased by him and turned over by him to the club of which he was the president.

The general charges of fraud with relation to the conduct of Mr. Berry also find no support in the record, and in our opinion are without foundation in fact. It conclusively appears that Mr. Berry was a man of charitable impulses, and we are convinced that he was persuaded by Mrs. Weir to undertake to help her from the goodness of his heart, realizing that, if no help was extended to her at the time she came to him, she would undoubtedly lose all her equity in the property inherited by her and be left without support of any kind. The conclusion is also irresistible that he did not enter into his dealings with her with any thought of receiving compensation for his service, and it is indeed unfortunate, in view of this kindly and charitable disposition on his part, that his acts should, by the bill of complaint filed in this cause, be clouded with even the suggestion of fraud.

Counsel for the trust company, as administrator, earnestly contend that the relation between Mr. Berry

and Mrs. Weir was simply that of lender and borrower, of mortgagor and mortgagee, and not that of trustee and beneficiary.  The trial judge was convinced, and found, that if Joseph H. Berry had lived to close this matter he himself would never have taken one cent of the money received from the. Country Club over and above the actual amount paid out in transacting the business, and this record cannot be read, in our opinion, without coming to the same conclusion.  But, whether this is true or not, a decision of this case need not be rested upon that ground.

Constructive trusts arise by operation of law.  The following is found in 39 Cyc. p. 169:

"Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element.  Actual fraud is not necessary, but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title.  Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done.  Such trusts are also known as trusts *ex maleficio* or *ex delicto*, or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice."

Also, the following, in 15 Am. & Eng. Enc. Law (2d Ed.), p. 1123:

"Implied trusts, properly speaking, are such only as arise by operation of law as contradistinguished from such as arise by properly executed agreements of the parties.  They are raised by law for the purpose of carrying out the presumed intention of the parties, or, without regard to such intention, for the purpose of asserting equitable rights of parties or frustrating fraud, and include the two classes of trusts known generally as resulting and constructive trusts."

As the author in the first quotation says, this form of trusts is practically without limit, and is raised by a court of equity whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice.

We are of the opinion that this record clearly establishes a fiduciary relation between Mrs. Weir and Mr. Berry. There can be no question that she gave him the fullest confidence as to her financial situation, and trusted in him to save her property for her, and gave him security for his advances by way of mortgages on her property. That he intended to help her, actuated by his charitable impulses, there is no doubt. He knew that she was absolutely dependent upon him to protect her from her creditors, and even for her living expenses. The fiduciary purpose which he undertook was to save to Mrs. Weir her property from loss at forced sales, and enable it to be disposed of to advantage at the best time at private sales, so that she might ultimately have the excess in value over her debts, and in the meantime provide support for her and her family. This purpose was carried out by Mr. Berry through the trust company, his agent, during his lifetime, and should now also be carried out by his administrator.

No criticism can be made of the conduct of the administrator in taking the position it has in seeking to protect the estate of Mr. Berry. But we are satisfied that, considering the manner in which the business relationship between Mr. Berry and Mrs. Weir was established, and the method of doing the business, the instant case presents just such a situation where the conscience of the court will impress on the proceeds of the sale of the property a constructive trust, and thus carry out what to the court seems necessary to prevent a failure of justice.

We are therefore in accord with the conclusion of the circuit judge that:

"There should be deducted from the amount received from Mr. Alger or the Country Club (the $165,-000) all amounts paid by Berry or the Union Trust Company as administrator or otherwise for Berry, or for the preservation of the property by way of taxes, costs, interests, or expenses, up to the time that the business was closed and the money came into the hands of the Union Trust Company." And that, "after the amount chargeable against the fund of $165,000 is determined and deducted, the complainant should have a decree for the amount remaining."

We are of the opinion, however, that, in the accounting provided for in the decree of the court below, the Union Trust Company, as administrator, should be charged with such interest as it shall appear said amount due complainant has earned while in its possession, from the date of the receipt of the money from Mr. Alger or the Country Club to the date of the decree in this court. With this modification, the decree of the circuit judge will be affirmed. Neither appellant nor cross-appellant will recover costs, but costs are allowed to the other defendants against the complainant.

BROOKE, C. J., and STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred. MOORE, J., did not sit.

The late Justice MCALVAY took no part in this decision.