BODEN *v.* RENIHAN.

Accounting—Fiduciaries—Attorneys—Evidence.

In suit for accounting by attorney who had acted as attorney for plaintiff's father's estate and as fiduciary for her in handling her financial affairs, evidence *held,* sufficient to require that he account to plaintiff as fiduciary for funds plaintiff had left with him for investment while acting as her attorney.

Appeal from Kent; Brown (William B.), J. Submitted June 6, 1941. (Docket No. 72, Calendar No. 41,649.) Decided October 6, 1941.

Bill by Sarah H. Boden against Joseph Renihan for an accounting. Decree for plaintiff. Defendant appeals. Affirmed.

Unjust enrichment, see Restatement, Restitution, § 1.
Violation of fiduciary duty, see Restatement, Restitution, § 138 (1).
Distinction between a constructive trust and an express trust or a resulting trust, see 1 Restatement, Trusts, § 1, comment (e).
Distinction between a trust and other fiduciary or confidential relationships, see 1 Restatement, Trusts, § 2, comment (b).

*Allaben & Wiarda,* for plaintiff.

*Norman A. Lilly,* for defendant.

BOYLES, J.   Plaintiff filed a bill in equity to compel an accounting of moneys claimed by plaintiff to have been entrusted to defendant for safekeeping and for investment.   The transactions began in 1915 and continued until suit was started in 1939. Plaintiff is an elderly lady, a resident of Grand Rapids, who never married.   The defendant (appellant) is a practicing attorney in Grand Rapids, admitted to the bar in 1893.   Plaintiff had decree in the court below for $6,100.

The parties first became acquainted in 1912 in connection with a will prepared by defendant for plaintiff's father who died in 1912.   Plaintiff acted as executrix of his will and defendant was the attorney for the estate.   Under her father's will, plaintiff received a farm which she sold in 1915 for $8,000 cash.   At the time of sale, the draft in payment was left with defendant overnight, and the next day plaintiff and defendant went to a bank, cashed the draft, plaintiff used approximately $2,000 to pay off the balance due from her on a land contract, and the remaining $6,000 was left in the bank.   The dispute arises mainly over the ultimate use or disposal of this $6,000, together with an additional $4,150 referred to later herein.   Plaintiff claims, and defendant admits, the money was left with the bank, although there is a dispute as to how it was to be withdrawn.   The parties agree, however, that there was a conversation at that time to the effect that defendant was to loan out this money for plaintiff and invest it in real-estate mortgages.   In that regard, plaintiff testified:

"*A.* And Mr. Renihan was to put that on real-estate mortgages; he concluded that would be the best thing.

"I never had seen Mr. Renihan until the morning my father died. Between the time my father died in 1912 and the time I closed up this Friend deal, I never had any other attorney. He took care of my father's estate.

"I had some conversation with Mr. Renihan about handling the money at the bank that morning. I asked him if he would handle the money; he agreed to handle it on real-estate mortgages.

"*Q.* He was to handle it for you on real-estate mortgages?

"*A.* Yes, well to the best of his—what he could get it out on, get the interest and everything.

"He was to invest it and I think I have given you all of the conversation. He said he would invest it.

"I don't think I had any of the $6,000. I had the interest on it as the interest came in but I never handled any of the $6,000 myself. Mr. Renihan paid me some interest after that time."

This occurred in 1915. There is some dispute as to the way the money was actually handled or withdrawn. In that regard, the plaintiff testified:

"*Q.* Then this last question, Miss Boden: The actual way that this $8,000 was taken out of the bank, whether it was by Mr. Renihan signing his own name or your name or some arrangement with the bank, so he could draw it out, do you know?

"*A.* I do not know how that was arranged; it was between him and Mr. Hefferan in some way; but of course, knowing as little as I did about those things, and I trusted to what they were doing, and Mr. Renihan drew the money evidently or got the money when they wanted to make loans and it was done in that way.

"*Q.* Are you perfectly sure that you, yourself,

did not draw that money out and loan it to the people directly?

"*A.* Oh, sure, I didn't have anything to do with it.

"*Q.* And when you left that day you didn't have any of the $8,000 with you?

"*A.* No, not a cent of it.

"Mr. Renihan and I discussed at the bank as to what was to be done with the balance of the money after paying up Miss Harmon's mortgage. I asked him if he would handle the money, and he said 'Yes,' he would.

"*Q.* Handle it how?

"*A.* For loaning out on real estate.

"*Q.* And what did he say?

"*A.* He said 'Yes, I will,' or something of that nature, I don't know that that is just the words or not."

In 1919, plaintiff sold her house on a contract for $4,150; the money on this contract was collected from time to time when due, by Mr. Renihan. Plaintiff testified:

"In 1919 I sold my house on La Grave street to Mr. Crinzi. The amount was $4,150, on contract. The money was paid to Mr. Renihan's office. I didn't get any of that, only just the interest money that would come in. It was finally all paid up. I don't think I got any of the $4,150. Mr. Renihan invested it as I understood it. I can't tell what happened to that money. It was left with Mr. Renihan. He said he thought real-estate mortgages was good and I agreed with him and he handled that, put it out on real-estate mortgages or in good investments of some kind. The interest came right along then; I was to get the interest."

Plaintiff thus claims that she left with defendant a total of $10,150 for handling and investment. It was her entire capital. From time to time thereafter, up to and including 1939, plaintiff occasionally

talked with Mr. Renihan about these investments. She did not know who borrowed the money; she never investigated or appraised the properties; the mortgages were never in her possession; and she had no information as to the investments except what she obtained from Mr. Renihan. On occasion, she was called to his office by Mr. Renihan to sign discharges of mortgages and testified that at no time was she given the principal of a mortgage, but that "it was turned right over to him to handle again;" that no part of the principal, $10,150, was ever paid to her. Plaintiff kept no books of account or record of moneys paid to her by Mr. Renihan. Her recollection of the details of the loans and the amounts received is hazy, and convinces us that the plaintiff relied entirely upon the defendant as her attorney and counselor and trusted agent to handle her investments. She testified that the defendant made the loans as he thought best and all her collections and transactions were through his office. The records in the register of deeds' office showed that between 1915 and 1922 plaintiff appeared as mortgagee in eight different mortgages approximating $10,000. These mortgages have all been discharged, and the record indicates there are now no mortgages of record in which plaintiff appears either as mortgagee or assignee. These mortgages and the discharges were all executed in Mr. Renihan's office, with either the defendant or a member of his office staff as notary and witnesses. After being recorded in the register of deeds' office, they were delivered back to Mr. Renihan. From time to time plaintiff received payments from Mr. Renihan, explained by her as being "interest payments," the amount of which she did not know. The largest amount received by her at one time as shown by defendant's cancelled checks was $366.77. Most of the checks

were under $100. She testified she had received no payments on principal. At one time Mr. Renihan claimed interest payments were not coming in and that some money he subsequently paid plaintiff was as a loan. There was some conversation about where the money was coming from that Mr. Renihan was paying her. She considered it an advance on interest and inquired whether she was paying him interest on it as her money was not coming in. In that regard, she testified:

"*Q*. Had you heard then that this was not your money, or had he told you it was not your money?

"*A*. No, he had not absolutely told me it was not my money; it was my money but I got kind of suspicious and I felt as though he was giving me money and not getting any interest on it.

"At that time Mr. Renihan told me that my investments were not paying any interest. When I did not get any interest at all, I went to Mr. Renihan to find out why. That was last March, this past March, we went down there, Louise and I, 'and he said it was not paying any interest, money was not coming in at all, and then he made a question as to —how things was done, don't you see, because the interest was not coming in and I wasn't getting any.' "

These transactions continued for a period of nearly 25 years, during which time plaintiff had no other attorney to look after her affairs except the defendant. In 1939, plaintiff's niece, with whom plaintiff had lived since 1918, went to Mr. Renihan's office to inquire about plaintiff's investments. She testified that the following took place:

"I talked with Mr. Renihan in April, 1939. I said to him that he had promised my aunt a statement of her account. He said, 'I never promised your aunt a statement.' I said, 'Well, when we and she were

here, you promised her one and we would like an account.' He replied that he did not promise her one and could not give her one. I asked, 'Mr. Renihan, what is auntie's money invested in?' He said, 'Three $2,000 mortgages in Walker township and no buildings on the land and the land does not produce anything.' I said, 'Why can't we foreclose on them?' Mr. Renihan said, 'We can't foreclose.' I said, 'If these people want that property very badly they will get government loans and you can foreclose.' He said, 'I cannot foreclose.' That was the only reason he would give me."

Plaintiff thereupon employed another attorney to look after her affairs. This attorney, Mr. Allaben, testified he went to see Mr. Renihan in July or August, 1939, and that the following occurred:

"I said to Mr. Renihan that Miss Boden and the two Misses Kelly who are nieces of Miss Boden had consulted me relative to a claim against him, Mr. Renihan. He said, 'Well, what is it that they want?' I said, 'Miss Boden states that you owe her about $10,000, a little over $10,000, for money that she had left with you to invest for her and that you had not paid back, and she has been unable to get an accounting from you although she has asked you repeatedly for it, and that she has been in to see you several times this spring and summer.' He said, 'Yes, they have been in to see me.' He said, 'The amount is not $10,000, it is about $6,100. He said, 'What is it that they want?' I said, 'They want the money and also want an accounting, a complete accounting.' I said, 'Miss Boden is getting along in years —' By Miss Boden I mean Miss Sarah H. Boden, the plaintiff in this suit. I said, 'Miss Boden is getting along in years and she is not in good health. She has a serious disease that makes her life uncertain and she has not even the scratch of a pen from you to show the fact that she gave you this money.'

'Well,' he said, 'I can give her a note. I will give her a note.' I said, 'For how much?' He said, '$6,100.' He said, 'That is about what it is.' "

He also testified that the defendant told him:

" 'Miss Boden and the girls will get every cent that is coming to them, provided they do not press me. He said, 'If they press me, I don't know as they will, but if they do not press me and if I live long enough, they will get everything that is coming to them.' "

It is apparent that plaintiff thus established that defendant was acting for her both as her attorney and in a fiduciary relationship as to the handling of her investments. He managed the loans and made the collections.

In *Chadwick* v. *Chadwick*, 59 Mich. 87, a bill was filed to enforce an alleged trust, averring the delivery of all of complainant's personal property to a son under an arrangement for its investment in business by the son, for their mutual advantage. This court said:

"We think the facts set up in the bill, though not as full as they might have been, nor as specific as good pleading requires, are still sufficient to support the complainant's case. The trust itself, as well as the breach, are fully stated. It requires no particular form of words to create a trust: 1 Perry, Trusts, § 112; *Harding* v. *Glyn*, 1 Atk. 469 (26 Eng. Rep. 299); *Bernard* v. *Minshull*, Johns. 276 (70 Eng. Rep. 427); *Warner* v. *Bates*, 98 Mass. 274; *Cummings* v. *Corey*, 58 Mich. 494; *Crissman* v. *Crissman*, 23 Mich. 217; *Ellis* v. *Secor*, 31 Mich. 185 (18 Am. Rep. 178). It will not be unfrequently inferred from the facts and circumstances of a particular case, and I think the facts in the present case quite sufficient to warrant such inference. *Leland* v. *Collver*, 34 Mich. 418; *Miller* v. *Aldrich*, 31 Mich. 408;

*Cromwell* v. *Brooklyn Fire Ins. Co.,* 44 N. Y. 42 (4 Am. Rep. 641); *Huxley* v. *Rice,* 40 Mich. 73. There can be no question but that the defendant received the property of complainant, and has held and controlled it many years. He did not own it, but used it. It was all the complainant had. He now needs it, and there is no reason in the world why the defendant should not now account for it.''

In *Beedle* v. *Crane,* 91 Mich. 429, the defendant had been, and was at the time of her death, attorney and agent of one Mary A. Crane, had collected a certain life insurance policy, and held the same for investment. At the time of her death, he was in possession of substantially all of her effects and the only person who knew the exact condition of her affairs. In setting aside a release obtained by the attorney, on the ground of misrepresentation and concealment, this court said:

''While the death of the client has been said to terminate the relation (Weeks, Attorneys, § 256), yet an attorney who, as such, receives property and effects from his client, and by reason of his relations had obtained full knowledge as to the condition and value of his client's property, cannot be said to be released from the obligations imposed by the relation until, in case of the death of his client, he has accounted to the proper parties, and turned over such property and effects. What property or effects are in his hands, he holds in trust for the heirs and representatives of the decedent. What information he possesses, he had obtained by virtue of the *quasi* fiduciary relation which existed between himself and client; and the law will not permit him to conceal and use such information for the purpose of driving a hard bargain with the heirs, for his own profit. If he will not aid, he cannot be allowed to mislead for his own advantage. The property and effects of the decedent, which he holds,

came into his possession in the character of an attorney; and that character must be held to continue with respect to any transaction between attorney and heir, relating to that property, until the property is accounted for and the information disclosed. The burden in such case is upon the attorney to show that the heir acted after a full disclosure by the attorney of all the information possessed by him. As was said in *Gray* v. *Emmons,* 7 Mich. 533, the attorney must show that the client acted freely and understandingly. *Jennings* v. *McConnel,* 17 Ill. 148; *Brock* v. *Barnes,* 40 Barb. (N. Y.) 521."

In a case where an employee was charged with the duty of keeping an accurate account of moneys received by him and of paying or accounting for the same to his employer, this court held:

"Defendant Holbrook occupied a fiduciary relation to his employer. It was his duty to keep a true and accurate account of all the moneys received, and to pay them over or account for them. If he failed to do this, the funds retained by him became, in his hands, trust funds belonging to complainant. He is charged with a breach of his trust, which is clearly shown. Its extent is peculiarly within his knowledge. In such case choice of remedies is with the party aggrieved, and he may proceed in equity for an accounting, and pursue the fund. *Darrah* v. *Boyce,* 62 Mich. 480; *Wyckoff* v. *Victor Sewing Machine Co.,* 43 Mich. 309; *Pierce* v. *Holzer,* 65 Mich. 264; *Clarke* v. *Pierce,* 52 Mich. 157." *Warren* v. *Holbrook,* 95 Mich. 185, 189 (35 Am. St. Rep. 554).

"Constructive trusts arise by operation of law. The following is found in 39 Cyc. p. 169:

" 'Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element. Actual fraud is not necessary, but such a trust will arise whenever the circumstances under

which property was acquired make it inequitable that it should be retained by him who holds the legal title.   Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done.   Such trusts are also known as trusts *ex maleficio* or *ex delicto,* or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.'

"Also, the following, in 15 Am. & Eng. Enc. Law (2d Ed.), p. 1123:

" 'Implied trusts, properly speaking, are such only as arise by operation of law as contradistinguished from such as arise by properly executed agreements of the parties.   They are raised by law for the purpose of carrying out the presumed intention of the parties, or, without regard to such intention, for the purpose of asserting equitable rights of parties or frustrating fraud, and include the two classes of trusts known generally as resulting and constructive trusts.'

"As the author in the first quotation says, this form of trusts is practically without limit, and is raised by a court of equity whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice." *Weir* v. *Union Trust Co.,* 188 Mich. 452, 463, 464.

" 'One occupying a confidential and fiduciary relation to another is held to the utmost fairness and honesty in dealing with the party to whom he stands in that relation. *Torrey* v. *Toledo Portland Cement Co.,* 158 Mich. 348.'   *Pikes Peak Co.* v. *Pfuntner,* 158 Mich. 412." *Stephenson* v. *Golden,* 279 Mich 710, 736.

"No one may take advantage of his own wrong. Void things are no things.   He that is guilty of inequity appeals in vain to equity.

" 'We turn now to constructive trusts. Under this head Mr. Lewin treats of but one grand rule. It is this: that wherever a person clothed with a fiduciary character gains some personal advantages by availing himself of his situation as a trustee, he becomes a trustee of the advantage so gained.' Maitland's Equity (2d Ed.), p. 80.

" 'A constructive trust is raised by a court of equity wherever a person, clothed with a fiduciary character, gains some personal advantage by availing himself of his situation as trustee; for as it is impossible that a trustee should be allowed to make a profit by his office, it follows that so soon as the advantage in question is shown to have been acquired through the medium of a trust, the trustee, however good a legal title he may have, will be decreed in equity to hold for the benefit of his *cestui que trust.*' Lewin on Trusts (13th Ed.), p. 191.

" ' "Trusts," in the broadest sense of the definition, embrace not only technical trusts but also obligations arising from numerous fiduciary relationships, such as agents, partners, bailees, et cetera.' *Rothschild* v. *Dickinson,* 169 Mich. 200." *Stephenson* v. *Golden, supra,* 737, 738.

" 'The term "fiduciary" or "confidential" relation, * * * is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.' *Beach* v. *Wilton,* 244 Ill. 413 (91 N. E. 492)." *Stephenson* v. *Golden, supra,* 739.

"Equity will construct a trust where a person gains something he should not be permitted to hold in equity and good conscience through actual fraud, abuse of confidence, or questionable means.

*Eliason* v. *Stephens,* 216 Iowa, 601 (246 N. W. 771). A trust *ex maleficio* is a constructive trust arising out of some fraud, misconduct, or breach of faith on the part of persons to be charged as trustee, which renders it an equitable necessity that a trust should be implied. *Yarborough* v. *Tolbert* (Tex. Civ. App.), 282 S. W. 302. A constructive trust arises not from agreement but from operation of equities in order to satisfy demands of justice. *Carleton Mining & Power Co.* v. *Railroad Co.,* 113 W. Va. 20 (166 S. E. 536); certiorari to United States supreme court denied, *West Virginia Northern R. Co.* v. *Carleton Mining & Power Co.,* 289 U. S. 734 (53 Sup. Ct. 594, 77 L. Ed. 1482).

" 'A constructive trust, as distinguished both from express and from implied trusts, may be defined as a trust which is raised by construction of equity, in order to satisfy the demands of justice and good conscience without reference to any presumed intention of the parties.' Snell's Principles of Equity (19th Ed.), p. 122.

"Unlike an express trust or a resulting trust, it is remedial in character. *Stephenson* v. *Golden,* 279 Mich. 710." *Union Guardian Trust Co.* v. *Emery,* 292 Mich. 394, 405.

Under the evidence thus adduced by the plaintiff in this case, the order of proof shifted and the defendant then became burdened with the duty to proceed with his proofs to show that he had accounted to plaintiff for the funds shown to have been entrusted to him. In *Thatcher* v. *Hayes,* 54 Mich. 184, Chief Justice COOLEY, writing for the court, held that in a suit for an accounting the defendant has the burden of proving what allowances should be made to him. While strict accuracy of statement requires the conclusion that the burden of proof never shifts, it is incumbent upon one who is shown to have received funds in a fiduciary relationship under the circumstances of the instant case to show that he has accounted for the funds.

"But where a fiduciary relation exists between the parties to a transaction the burden of proof of its fairness is upon the fiduciary. Nor are courts of equity in dealing with transactions between persons occupying fiduciary relations towards each other, confined to cases in which there are any formal or technical relations of that character, such as guardian and ward, parent and child, et cetera; they apply the principle to all cases in which confidence is reposed by one party in another, and the trust or confidence is accepted under circumstances which show that it was founded on intimate personal and business relations existing between the parties, which gave the one advantage or superiority over the other, and impose the burden of proving that the transaction was fair and just on the one receiving or acquiring the benefit." 10 R. C. L. p. 898.

Defendant testified in his own behalf, and his countershowing consists solely of his own testimony and exhibits. He admitted arranging loans for plaintiff on various real-estate mortgages, and that he was acting for plaintiff as her attorney in preparing mortgages and discharges, making investments, collecting interest, receiving payments, and remitting to her. Defendant claimed that, with one exception, he had forwarded or delivered to plaintiff all payments received, both of principal and interest, when received, and that he had subsequently made up to plaintiff in instalments about $1,200 that he had retained out of her money at one time. Defendant kept no account of the various transactions, or the receipt or payment of money, except by cancelled checks or check stubs and a single ledger page produced by defendant. The cancelled checks and vouchers produced by defendant showing payments claimed to have been made to plaintiff total $3,948.40. The ledger account indicates payments claimed to have been made totaling $575. The record is not plain whether these claimed ledger payments are

duplications of payments shown by cancelled checks or stubs, although some dates and amounts would indicate duplications. Some of the checks were not made payable directly to plaintiff or indorsed by her. The total amount of documentary proof of payments introduced by defendant is somewhere around $4,000 or $4,500. Defendant claimed also there were other cancelled checks that he could not locate, although admitting they might be among some of his files that he had not separated out. Failure to produce evidence within a party's control raises a presumption that if produced it would operate against him. Every intendment is in favor of the opposite party. *Stephenson* v. *Golden, supra.* Defendant also claimed he had advanced money or made loans to the plaintiff amounting to $785 during the years 1934 to 1939, inclusive, during which time he had discontinued making any other payments to plaintiff, and asked for a decree in his favor for $689.17. It is significant that defendant makes no claim for interest on these loans, although he admittedly was in financial difficulties. Neither did defendant make any charges against the plaintiff for his legal services or any other services rendered for her, except in one case to quiet title. He admitted he had never given the plaintiff any statement of account, although a written statement had been demanded, and admitted that he kept no account of her matters. He depended entirely upon cancelled vouchers for his bookkeeping. He claimed:

"*A.* I sent her her money, which she asked for it. I sent it when it came to my office, I sent it to her. I produced plenty of checks to show that she got all the money that ever came into my office."

Defendant admitted that when plaintiff asked for money or for an accounting, he said there was no money available for her at that time and that he

could not give a statement at that time. At different times, defendant claimed he had oil-field investments, or other prospects, and if they proved out he would straighten everything out.

We have reviewed the record at length because of appellant's main contention that, under the evidence introduced, the plaintiff did not prove that the defendant was indebted to her, but that, on the contrary, it proved that plaintiff was indebted to the defendant. The evidence plainly preponderates in plaintiff's favor. In entering a decree for $6,100 in favor of plaintiff, the court made an allowance to the defendant of over $4,000 on account of the documentary proof of defendant's payments. While this ignored the fact that plaintiff might be entitled to interest received by defendant on her investments over the long period of years, there was some indication that plaintiff had made claim only for a balance due of $6,100. Defendant cannot complain of any lack of consideration given him in determining the final amount due. The record would justify a decree in excess of the amount rendered.

The only other question raised by defendant is that plaintiff's action is barred by the equitable doctrine of laches or the statute of limitations. This was not pleaded by the defendant as an affirmative defense, nor was this question raised in the court below, and cannot now be considered by this court. Court Rule No. 23, § 3 (1933); *Fowler* v. *McQuigg,* 222 Mich. 178; *Stolte* v. *Krentel,* 271 Mich. 98; *Snider* v. *Schaffer,* 276 Mich. 92.

Affirmed, with costs.

CHANDLER and NORTH, JJ., concurred with BOYLES, J.

WIEST, J. (*concurring*). I concur in the result but not in the holding that defendant was a trustee.

To hold defendant to account for his stewardship does not require a finding that he was a trustee. As plaintiff's attorney he assumed a fiduciary relation in handling her financial affairs and in that capacity is properly held to account for his doings.

Sharpe, C. J., and Bushnell, Starr, and Butzel, JJ., concurred with Wiest, J.