ZIMMERMAN *v.* FELDMAN.

1. APPEAL AND ERROR—DE NOVO—SUPREME COURT BOUND BY RECORD.

   On appeal from a decree in the chancery court the hearing is *de novo,* and the Supreme Court must be governed by the record.

2. FRAUD—EVIDENCE—BURDEN OF PROOF.

   One seeking relief in the chancery court on the ground of fraud must establish the fraud by convincing evidence.

3. SAME—CONTRACTS—EXCHANGE OF PROPERTIES—EVIDENCE—SUFFICIENCY.

   In a suit to rescind a contract for the exchange of properties on the ground of fraud, evidence *held,* insufficient to establish the fraud.

Appeal from Wayne; Goff (John H.), J. Submitted October 27, 1921. (Docket No. 63.) Decided February 8, 1922.

Bill by Fred C. Zimmerman and another against Samuel Feldman and others for the rescission of a land contract, and for an accounting. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*John R. Rood,* for plaintiffs.

*Friedman & Meyers,* for defendants Feldman.

*Maxwell S. Friedland* and *Wurzer & Wurzer,* for other defendants.

MOORE, J. The plaintiffs are brothers-in-law. On November 21, 1917, defendant Hine entered into a written contract with plaintiff Wirth for the sale to him of a large apartment house on Hendrie avenue in

the city of Detroit.     The consideration named in the contract was $83,000.     At this time Mr. Wirth conveyed to Mr. Hine certain lands at Mt. Clemens, Michigan, which conveyance was received as a payment of $15,500 on the contract, leaving unpaid thereon $67,500 which was to be paid at the rate of $500 on the 10th of each calendar month.     The contract was a long one and it will not be necessary to recite the other provisions contained therein.     Mr. Wirth immediately entered into possession of the Hendrie avenue property.     It soon developed that the rentals would not pay the expenses of the upkeep of the apartment house and meet the monthly payments.     Mr. Zimmerman came to the rescue of Mr. Wirth and advanced upwards of a thousand dollars, mostly to pay for coal which was bought during the winter in which coal was so hard to get.     Mr. Zimmerman and Mr. Wirth were both agreed that Mr. Wirth should sell or exchange the property for something Mr. Wirth could handle.     The claim is that Mr. Mitchell was employed for that purpose.     Mr. Feldman was the owner of a much smaller apartment on Canfield avenue.     He had given defendant Goldberg an option to sell the property for $25,000 net to Feldman; all above that sum received for the property to be retained by Mr. Goldberg as his commission.     Mr. Mitchell interviewed Mr. Goldberg for the purpose of trying to effect an exchange of the properties.     All this time Mr. Wirth was confined to his house as the result of an accident, and it is claimed that Mr. Zimmerman actively represented Mr. Wirth in the negotiations, and it is also claimed by the defendants that Mr. Zimmerman was furnished with a list of the apartments contained in the Canfield avenue apartment, and the rentals received therefrom, and that he visited it for the purpose of checking up the list and inspecting the property.     This claim is not admitted by Mr. Zimmerman.

The result of the negotiations was that an exchange of the properties was agreed upon between Wirth and Goldberg, April 8, 1918, which agreement was put in writing. At this time a note for $1,000 was given to Goldberg by Wirth and Zimmerman which Goldberg claims was given to him because some cash payments that were due Mr. Hine had not been met. The fact that the note was given is admitted, but Wirth and Zimmerman do not agree with Goldberg as to the reason for giving it.

April 18, 1919, Feldman made a contract with the plaintiffs for the Canfield avenue property, in which the consideration was stated to be $40,500, in which contract it was recited that $15,500 was paid on that date. It is claimed by the defendants that this recital was put in at the request of the plaintiffs to help them to sell the property. The balance of the consideration was to be paid in monthly payments of $165 or more. On this day or the day before Mr. Wirth assigned the Hine contract to Mr. Goldberg. Mr. Hine never consented to, or recognized, this assignment. Later the payments were not made and Mr. Hine took possession of the Hendrie apartment. The plaintiffs immediately upon the making of the contract entered into the possession of the Canfield property. In January, 1919, Mr. Wirth had failed to make all the monthly payments to Mr. Feldman and the latter on February 6, 1919, instituted a suit before one of the circuit court commissioners for the purpose of getting possession of the premises. That case found its way to this court and is reported in 208 Mich. 240. In that case the appeal taken from the circuit court commissioner by the plaintiffs in the case now before us was dismissed.

On February 11, 1919, the original bill now under consideration was filed. It was averred therein that a fraud had been perpetrated in that the Canfield

property had been represented to be new and sound, and that the amounts received as rents had been overstated, and the prayer was for a rescission, and that Goldberg and Feldman might be required to reimburse the plaintiffs for the amounts paid and expended by them.    July 19, 1920, an amendment was made to the original bill of complaint reciting the proceedings before the circuit court commissioner · and in this court, and prayed for an injunction and other relief.

August 21, 1920, a second amendment to the bill of complaint was filed and counsel stated on the oral argument that the relief now asked in this court is as follows:

"And because of the wrongs mentioned in paragraph 13 of the amended bill of complaint, and in the original, amended and supplemental bills of complaint, the plaintiffs pray for a decree for the reconveyance to them of their equity described in paragraphs 1, 2, 2a and 3 of the original bill of complaint; the repayment to them of the moneys they were induced to part with by reason of the fraud; a credit on the purchase price of the property described in paragraph 5 of the original bill of complaint to the extent of the damages suffered by these plaintiffs by reason of the several frauds of the said defendants; and all the other reliefs prayed for in any paragraphs of the original, amended and supplemental bills of complaint."

Various answers were filed by the defendants in which they denied all allegations of fraud and Mr. Hine filed an answer in the nature of a cross-bill in which he asked· for affirmative relief.    The defendants averred that the parties dealt at arms' length and that the Hendrie property was not worth more than the debt against it.    The first part of the decree entered in the case after a hearing in open court finds that the charges of fraud made in the various bills of complaint are not sustained, and dismissed all of the bills of complaint with costs.    The second part

of the decree undertakes to deal with the equities of the defendants with each other.   The plaintiffs are the only ones who have appealed from the decree.

The first question to be considered is, Are the charges of fraud sustained?   The plaintiffs called Feldman and Goldberg as adverse witnesses.   Their testimony in so far as it was material tended to negative the charges of fraud.   Mr. Mitchell and Mr. Zimmerman were also sworn on the part of the plaintiffs. Their recollection of what was said and done did not seem to be very clear.   They were in conflict however in relation to one material thing.   Mr. Mitchell testified that Mr. Zimmerman visited the Canfield avenue property while the negotiations were going on.   We quote:

"I do not know whether Mr. Wirth investigated the Pennsylvania property.   He said he might go over in a machine to look it over, but he was not certain whether he could get there or not.

"*Q.* Do you know from what he told you that he went out and investigated the property?

"*A.* Yes, sir.   They went out together.   Mr. Zimmerman told me he had some interest in the Seaman court apartments, that he was looking after the rents or some collection and they put up some money at one time or another and he wanted to get his money back."

This was denied by Mr. Zimmerman and Mr. Wirth. The testimony was in conflict as to what was said and done.

We quote some of Mr. Zimmerman's testimony:

"Mr. Mitchell came in to see me several times before this deal was consummated or anything done.   *   *   *   I had no interest pecuniary in this matter but to protect my brother-in-law Mr. Wirth.   *   *   *   They said that if the exchange was made they would expect me to sign the papers, during the conversation that came up.   Mr. Wirth made all the arrangements.   *   *   *   Mr. Mitchell told me Goldberg had an interest

to sell and wanted to sell this property and make an exchange here. I don't know at that time that there was any statement of the interest that Goldberg claimed. I don't know of any information received as to Goldberg's interest at that meeting. I left that entirely with Mr. Mitchell and Mr. Wirth. I was busy and didn't pay any attention to it. Mr. Mitchell did not state to me that I know of. * * *

"I didn't know that Mr. Feldman was in the deal at that time. I first learned that the night the contract was brought to me to sign. There was some question as to his interest but I don't know that I ever knew what it was. There was a memoranda there produced during the talk showing the rent of the property."

Cross-examination by Mr. Wurzer:

"*Q.* So far as you personally are concerned you don't claim any interest in the Seaman court property sold by Mr. Hine to Mr. Wirth?

"*A.* I had from twelve to sixteen hundred dollars in that property which I had virtually abandoned. Also I had to buy coal and heat the building on the Seaman court property and I virtually call that off. I claim no lien on the property in any way. No lien nor title, and I claim no proprietary interest, except what my brother-in-law had. It is his, not mine. Personally, I have no interest except that money that I have advanced to Mr. Wirth and that, I say, is gone. * * *

"I don't remember the time that I first learned that Goldberg had some property to exchange for the Seaman court apartment. I don't know how long it was before the preliminary agreement was drawn up. I was not consulted. I knew there was something pending. I never went out and looked after it. * * * I did not go up to inspect the Pennsylvania and Canfield avenue property nor make a statement to that effect to Mr. Mitchell. Mr. Wirth gave me no instructions to look after that transaction for him. I believe that Mr. Wirth was at home in bed at this time due to an automobile accident. It was along about the 8th to 18th of April.

"*Q.* Wirth was not able to go out and look at this property?

"*A.* I didn't look it over. The first time I saw it was three months afterwards and I will swear I never stated to Mr. Mitchell that I inspected the property and found it all right, or that I was satisfied to go ahead with the deal."

We quote some of Mr. Wirth's testimony:

"*Q.* You did not meet Mr. Feldman until some time after the deal was finally closed up?

"*A.* It was quite awhile after.

"*Q.* And you had no talk with him before making the deal?

"*A.* No.

"*Q.* You had Mr. Zimmerman look after the deal for you?

"*A.* Yes, sir.

"*Q.* You were satisfied with anything he did in the matter?

"*A.* Yes, sir, of course, I could not get out.

"*Q.* He consulted with you before the papers were executed?

"*A.* Yes, sir.

"*Q.* You were crippled at the time Exhibit 2 was signed?

"*A.* No, I was down in bed.

"*Q.* Did you talk with Mr. Zimmerman about signing it before it was signed?

"*A.* I don't think it. It was brought to me and I looked it over and signed it. I think Mr. Mitchell brought it over.

"*Q.* You are sure you did not have any talk with Mr. Zimmerman before you signed it?

"*A.* No, I may have.

"*Q.* You discussed the deal generally with him? You told him you were going to get this apartment on Canfield and Pennsylvania avenues, subject to an indebtedness of $25,000 for your equity in the apartment on Hendrie avenue?

"*A.* Yes, sir.

"*Q.* And you told him where this Canfield and Pennsylvania avenue property was, and told him to look at it?

"*A.* I did, yes.

"*Q.* You did not see it yourself?

"*A.* No.

"*Q.* Did Mr. Zimmerman report back to you about his visits to the place?

"*A.* No, I saw him two months later and he said he had not seen it, till later.

"*Q.* You asked Mr. Zimmerman to take a look at it before you signed this paper?

"*A.* Yes, sir.

"*Q.* You don't mean to say you signed this paper before you got a report back from Mr. Zimmerman?

"*A.* No, I don't think I did.

"*Q.* He must have given you a report as to the condition of that property. And it was after you got the report from Zimmerman that you signed this paper?

"*A.* Yes, sir.

"*Q.* This land contract, Exhibit 4, was also brought to your house for your signature?

"*A.* Yes, sir.

"*Q.* You entrusted to Mr. Zimmerman the collection of the rents and he told you Mrs. Belcher was doing it for you?

"*A.* Yes, sir.

"*Q.* And I presume that Mr. Zimmerman reported to you in May the statement from Mrs. Belcher about the discrepancy in the rent and told you about the defective condition of the premises as soon as he learned about it?

"*A.* Yes, sir.

"*Q.* He told you what the grocer said about the roof and sewer?

"*A.* Yes, sir.

"*Q.* How soon after you got the property did you know that?

"*A.* About a month after.

"*Q.* You did not get your first month's rent directly until about the middle of May, and then knew there was trouble with the roof and sewer?

"*A.* Yes, sir.

"*Q.* You knew that before the first payment was made to Mr. Feldman, May 31, 1918?

"*A.* I don't believe I did.

"*Q.* It was not more than a month after you bought the property that you knew it was not in good condition.

"*A.* No.

"*Q.* As soon as he found out what the condition of the property was, Mr. Zimmerman discussed it with you and you knew right along?

"*A.* Yes, sir. * * *

"*Q.* You were willing to leave the whole matter to him anyway.

"*A.* I could not do anything.

"*Q.* He also told you he was getting a reduction in the payments from $165.00 to $155.00, and you knew at that time that the property was not in good shape and that was one of the reasons he got Feldman to reduce the payments, because it cost so much money for repairs, and the rents were not bringing in enough?

"*A.* Yes, sir. * * *

"*Q.* You also knew about the way the note was taken care of that was given to Goldberg?

"*A.* Yes, sir.

"*Q.* Three or four months after the note was given you settled with Goldberg on it and knew then that the rent had been misrepresented and that the property was not in good condition, as represented?

"*A.* Yes, sir.

"*Q.* It did not make any difference to you, when you bought, and you were getting a land contract from Goldberg, or from Feldman, so long as there was $25,000 against it and you didn't have to make payments more than $165 per month.   Is that not right?

"*A.* Yes, sir.

"*Q.* The fact that Feldman was not getting anything out of the deal, and Goldberg was getting the Hendrie avenue property, did not cut any figure as far as you were concerned?

"*A.* No.

"*Q.* You did not discover that until after you had filed the bill of complaint in this cause?

"*A.* No.

"*Q.* If the property had been in good condition and the rent had been as represented, you would have had no cause for complaint, and those are the only two

complaints you have got; first, the condition of the property, and second the rents were not as represented?

"*A.* Yes, sir.

"*Q.* You kept making your payments to Feldman right along after you knew all these things?

"*A.* Yes, sir."

The chancellor had the great advantage of seeing and hearing the witnesses. This, of course, is a hearing *de novo* and we must be governed by the record. It has however been said:

"There are many aids possessed by the judge who hears the oral testimony in deciding who of the witnesses are truthful that do not get upon the printed page." *Donaldson* v. *Donaldson,* 134 Mich. 291.

The testimony offered on the part of the defendants was to the effect that no misrepresentations were made, that Mr. Zimmerman examined the Canfield avenue property and that both plaintiffs were anxious to make the exchange. When one bases his claim for relief upon the ground of fraud it becomes his duty to establish the fraud by evidence that is convincing that the fraud was perpetrated. *Peaslee* v. *Collier,* 83 Mich. 549; *Zucker* v. *Karpeles,* 88 Mich. 413; *Bly* v. *Brady,* 113 Mich. 176; *Raymond* v. *McKenna,* 147 Mich. 35; *Island Mill Lumber Co.* v. *City of Alpena,* 176 Mich. 575; *Donnelly* v. *Lyons,* 173 Mich. 515; *Appenzeller* v. *Appenzeller,* 177 Mich. 303; *Weir* v. *Union Trust Co.,* 188 Mich. 461.

We think the plaintiffs have not met the burden that the law puts upon them in order to establish the fraud. Having reached this conclusion, and, as no one but the plaintiffs has appealed, it is unnecessary to discuss the other questions.

The decree is affirmed, with costs to the appellees.

FELLOWS, C. J., and WIEST, STONE, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.