GARDNER *v.* GARDNER.

1. PARTIES—DEATH—SUBSTITUTION OF EXECUTOR. .
   Upon the death of a party to suit involving specific performance
   of a contract during pendency of appeal, the executor of his
   estate was properly substituted in his place (Court Rule
   No. 72, § 1 [b] [1945]).

2. SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY INTEREST IN
   LANDS—STATUTE OF FRAUDS.
   In suit for specific performance of an oral contract to convey an
   interest in real estate the plaintiff must show not only that
   such a contract was made but also that there has been such
   a performance on his part that it would be a fraud upon him
   to permit the defendant to assert the statute of frauds
   (3 Comp. Laws 1929, § 13413).

3. APPEAL AND ERROR—DE NOVO REVIEW—SPECIFIC PERFORMANCE—
   CREDIBILITY OF WITNESSES.
   While review by Supreme Court of a suit for specific performance
   of an oral contract to convey an interest in lands is *de novo*
   and the Court is governed by the record, the fact that the
   circuit judge had the opportunity to determine the credibility
   of the parties and witnesses who testify must be taken into
   consideration in reviewing conflicting testimony in the record.

4. FRAUD—EVIDENCE—BURDEN OF PROOF.
   One seeking relief in the chancery court on the ground of fraud
   must establish the fraud by convincing evidence.

5. SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY INTEREST IN
   REAL ESTATE—EVIDENCE—FRAUD.
   In son's suit for specific performance of alleged oral contract
   to have title of property conveyed to the parties jointly so that
   plaintiff would have the property at his father's death, evi-
   dence *held*, insufficient either to establish the contract or that
   it would be a fraud upon plaintiff to allow defendant to invoke
   the statute of frauds (3 Comp. Laws 1929, § 13413).

Statute of frauds, general rule as to interest in land, see 1 Restate-
ment, Contracts, § 178(1); effect of part performance, see § 197;
effect of payment of price, see § 193, comment d.

Appeal from Kent; Souter (Dale), J. Submitted April 3, 1945. (Docket No. 14, Calendar No. 42,948.) Decided June 4, 1945.

Bill by Rozell A. Gardner against Glenn E. Gardner to specifically enforce an alleged agreement to have title to real estate in parties jointly. Josephine Gardner added as party plaintiff. Decree for defendant. Plaintiff appeals. Suggestion of death of defendant and Clifford Gardner, executor of the estate of Glenn E. Gardner, deceased, substituted as party defendant. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiff.

*Allaben & Wiarda,* for defendant.

BOYLES, J. Plaintiff Rozell A. Gardner filed this bill of complaint against his father Glenn E. Gardner, alleging that his father had orally agreed in 1929 to purchase a home in Grand Rapids for said plaintiff and cause the title deed to be made in their joint names with right of survivorship, provided the plaintiff would move into the premises and make a home there for the father. It is undisputed that Glenn E. Gardner did purchase the home but took title in his own name, and plaintiff's bill seeks specific performance of the claimed oral agreement. The circuit judge after an extended hearing dismissed the bill of complaint and plaintiff appeals.

During the hearing Rozell A. Gardner asked for and was given leave to add his wife Josephine Gardner as a party plaintiff, some question having been raised as to her dower rights if plaintiff prevailed. No claim is made of any agreement that she was to be made a grantee in the asserted title, and in this

opinion we will refer to plaintiffs in the singular, meaning Rozell A. Gardner. At the time of the hearing before the circuit judge, Glenn E. Gardner, defendant, was living and testified in his own behalf. Since entry of the decree and while the appeal was pending in this court Glenn E. Gardner died and Clifford Gardner, executor of the estate of Glenn E. Gardner, has been substituted as party defendant by proper suggestion of death on the record and by order of this court. Court Rule No. 72, § 1 (b) (1945). While this has a bearing on the title of the case and on one of the issues raised on appeal, we reach decision on another ground. We agree with appellant's brief, that:

"In cases of this type there are always two paramount questions, first, was the contract made? and second, has there been such a performance on the part of the party seeking the decree that it would be a fraud upon him to permit the defendant to assert the statute of frauds?"

However, we do not agree with appellant that plaintiff has proven the alleged contract or otherwise made his case.

The statute of frauds (3 Comp. Laws 1929, § 13413 [Stat. Ann. § 26.908]) provides:

"Every contract * * * for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing."

It may be conceded that there are situations where fraud has been alleged and proven, constituting an exception to the general rule expressed by the statute. See *Woods* v. *Johnson,* 266 Mich.

172; *Morten* v. *Zevalkink,* 304 Mich. 572; *Sword* v. *Aird,* 306 Mich. 14. Plaintiff relies on a claimed oral contract to have title taken in his name jointly with his father, whereby his title would become absolute upon his father's death. In order to have specific performance of an oral contract for conveyance of land, plaintiff not only has the burden of proving the alleged oral contract, but also must prove that his acts of performance in pursuance of the claimed oral contract have been to an extent and of a kind to create such strong equities in his favor that courts of equity should not permit the statute of frauds to be used as an instrument to defeat the oral contract. *Harrison* v. *Eassom,* 208 Mich. 685.

Plaintiff testified that the alleged oral agreement was made in 1929. It appears from the record that plaintiff and his family were then living in Grand Rapids; that he was employed in Grand Rapids and had an offer of a job in Detroit for much more money; plaintiff testified that when he told his father of the Detroit offer his father said:

"'Don't do it, because if you stay here, you will be money ahead, because I am going to buy this place for you and I think if you got your home here and living in a smaller city, with the wages, you could be much better off and also will give me a home.' He talked with me about him buying a home several times. He commenced to talk with me about buying the home six or seven months before he bought this one. * * * He says, 'Don't go,' and he says, 'I will buy you this place or some place and with the job you got now it will make a better set-up for you than going and living in a larger city,' and he says, 'It will also give me a home,' and he says, 'I will see it is made out jointly so if anything happens to me it will revert back to you.'"

Finally the father bought the house on Francis avenue here in question, handed the key over to Josephine Gardner, plaintiff and his family moved in (in the fall of 1929) and have since continuously occupied the place as their home. Plaintiff made some repairs and improvements, such as grading the lot, planting trees and shrubs, painting, decorating, installing storm windows, and except for one year has paid the taxes during his approximately 15 years of occupancy. Plaintiff provided a room which his father furnished and from about 1932 to about 1939 his father occupied the room for several months each year, otherwise spending long winters in Florida and his summers at a cottage at Gun Lake. When this home was purchased in 1929 Glenn E. Gardner had a home in Middleville and was living there with his mother. He continued to live there until in the summer of 1932 at which time his mother died. From that time on until 1939 he alternated between living with plaintiff in the home in Grand Rapids as above stated, in Florida for the winters, and at his cottage at the lake during the summers. Referring to the purchase of the home in question, the father testified:

"He (Rozell) did live with me after I bought it. He had trouble with his wife and he left home. He was renting some property over on the west side and he left home and went out in the country. Then we got after him to come back and he came back to his wife's sister's and lived with her for a few days and we finally got them together. Then I think I gave him the privilege of he and his wife coming to live with me at Grand Rapids there, with the understanding that I wouldn't charge him as much rent for a short time. That is what I told him. * * * I did not tell him that I would put the deed in our joint names. I never told him that, him

nor her nor anybody else. They came and lived with me then there on Francis avenue, they moved in. I lived there too. They did not pay me a bit of rent. I did ask them for rent. I talked with his wife on the front porch one day, and we got to talking about the rent and I told them that we had agreed that we ought to have about $40 a month."

Since 1939 Glenn E. Gardner has not lived with Rozell in Grand Rapids. He testified he left the place because he could not "stand" Rozell's actions —"drinking," "out nights," "mean to his wife." In May, 1943, he wrote to Rozell as follows:

"I am writing you this letter to advise you that I have made up my mind that it will be necessary for you to pay me rent for the use of my house. So, starting the first of June I will have to have $50 per month rent, payable on the first of each month.

"You have had the use of the house rent free for a good many years, as well as many other considerations. It is time that you should attempt to make to me some repayments. Also, this is too large an investment not to have some income from, as well as to get back some of the money which is due me."

A week later Rozell wrote his father in Middleville a letter in reply, from which we quote:

"Dear Dad:

"I received your letter last week and was glad to get it. I have felt for some time that I would like to talk to you about these matters, but just never could get the courage to approach you.

"I want you to know that I want to do the very best I can to make up for the wrong I have done you as I am sorry for it all.

"I note what you have to say in regard to the house. If you will remember, we did not ask you to buy this house, but you did it of your own accord,

and when we talked about rent you made the proposition that we were to pay the taxes and general upkeep in lieu of rent.

"If you will recall when we moved in, there was not a blade of grass or a tree on the lot. Each year we have gone to some expense in putting in shrubbery, trees, et cetera, to build up the yard. Also we have kept the house in A 1 repair, having decorated the inside completely in 1934 (as there was no finish on the walls whatever). Together with this we have paid not less than $75 per year in taxes with the exception of the one tax payment which you made. The house has been painted twice on the outside while we lived here, you having paid $20 for the paint the first time.  *  *  *

"Due to this our financial condition is rather low, and after figuring out all the ways and means that we have at our command, the very best we could do is the following:

"We will still continue to pay the taxes and keep the place in repair as we have in the past and beginning July 1, 1943, start paying you $25 per month on the money due you.

"I will wait to hear from you in regard to this and if you would care to talk it over personally, I would be glad to make arrangements to come and see you as I would like to have the matter straightened out."

Shortly afterward Glenn E. Gardner caused to be served on plaintiff Rozell A. Gardner a notice to terminate tenancy or pay rent, which precipitated the present suit. It is worth comment that plaintiff claims he first learned that the deed was not joint when he received the notice to quit or pay rent, although admitting he had received his father's letter demanding rent several months previously.

It must be conceded that this is a difficult case to determine the equities, on the testimony shown

by the record. Plaintiff introduced testimony by other witnesses that his father said he was buying "a home for Rozell." Glenn E. Gardner definitely denied making such a statement. One of appellant's witnesses first testified (referring to Glenn E. Gardner):

"When he bought the property, he said he bought that and *intended to give it* to Rozell."

Later, the same witness testified that Glenn E. Gardner said he would have a joint deed drawn up. The understanding between Rozell and his father was not clear. Must an inference necessarily be drawn from the testimony that the father agreed to a joint title between himself and Rozell, or may it be inferred that the father was merely buying the property as "a home for Rozell," as expressed by some of plaintiff's witnesses? It is undisputed that Rozell occupied the property rent-free for more than 15 years, by providing the upkeep and repairs, paying the taxes, making some improvements, and at times providing a home for his father. Bearing on the equities of the case, the total expenditures claimed by plaintiff to have been made by him for taxes, upkeep, improvements and repairs during the 15 years of his occupancy amount to only about half what a reasonable rent would amount to, according to undisputed testimony in the record. There was a conflict of testimony as to the cost of board and services performed by plaintiff and his wife during the periods of time Glenn E. Gardner occupied a room in the home. Plaintiff admits he owes his father some money, and there is a dispute as to how much money he had from his father during these years. During all this time Rozell made no claim of joint ownership or inquiry as to whether he had any interest in the title. While much testi-

mony was received as to the amount paid out by plaintiff for taxes, upkeep, repairs, and expenses for his father whenever the father occupied the home, this is not a suit at law to recover the same, nor are we here concerned with a contest between Rozell and the other son of Glenn E. Gardner as to which one shall have the most of his father's property or estate. Much time was wasted at the hearing to show Rozell A. Gardner's bad personal habits and character, and previous moral transgressions, none of which has any material bearing on the issues in the case.

Decision must turn on a consideration of the equities of the case. While we review the case *de novo* and are governed by the record, we do not overlook the fact that the circuit judge had the advantage of seeing and hearing the witnesses. The opportunity of the circuit judge to determine the credibility of the parties who testify, and that of their witnesses, is an element which may be taken into consideration in reviewing the conflicting testimony of those witnesses as we find it in the printed record. *Murray* v. *Keeley Institute of Western Michigan,* 190 Mich. 295, 310; *Zimmerman* v. *Feldman,* 217 Mich. 390, 399.

It is elementary that one who bases his claim for relief upon the ground of fraud must establish the fraud by evidence which is convincing. *Zimmerman* v. *Feldman, supra,* and cases cited. This record falls short of convincing that a fraud was perpetrated on plaintiff by his father. We conclude that plaintiff has not sustained the burden of proving that his father agreed to an arrangement for a joint deed whereby plaintiff should have the full title to the property in question at his father's death, nor has there been such a performance by plaintiff that it would be a fraud upon him to allow

the defendant to invoke the statute of frauds. In view of such conclusions we need not discuss the other reasons advanced by the circuit judge for his decision nor the other reasons advanced by appellant for reversal.

The decree dismissing the bill of complaint is affirmed, with costs of both courts.

STARR, C. J., and NORTH, WIEST, BUTZEL, BUSH-NELL, SHARPE, and REID, JJ., concurred.