DIGBY v. THORSON.

1. TRUSTS—CONSTRUCTIVE TRUST—FIRST PREFERENCE IN PURCHASE
   OF LAND.
   Where defendant bought a tract of land for $12,700, upon a
   part of which were buildings, after plaintiffs had acquired a
   first preference of purchase from the previous owner, and
   arrangement was that plaintiffs were to pay defendant $7,000
   for improved portion including personal property thereon, a
   constructive trust is imposed in favor of plaintiffs, which
   defendant is required to fulfill upon completion of payment of
   purchase price to or on behalf of him.

2. SAME—EQUITY.
   Fraud is not necessary to give rise to a constructive trust, but
   if circumstances are such as to render it inequitable for the
   holder of the legal title to retain the same, the court may
   charge it with a trust in favor of the equitable owner.

3. SAME—IMPLIED TRUST—INTENT—EQUITY—FRAUD.
   Implied trusts arise by operation of law as contradistinguished
   from those that arise from agreements of the parties, and are
   raised by law, for the purpose of carrying out the presumed
   intent of the parties, or without regard to such intention for
   the purpose of asserting equitable rights or frustrating fraud.

4. SAME—CONSTRUCTIVE TRUSTS—CREATION.
   Constructive trusts arise by operation of law, not by agreement
   or from intention, and are raised by a court of equity when-
   ever it becomes necessary to prevent a failure of justice.

5. FRAUDS, STATUTE OF—FRAUD—EQUITY—CONSTRUCTIVE TRUSTS.
   The statute of frauds, including its provisions that a trust be
   created by a written instrument, is not a bar which may be
   raised in a court of equity by one who has obtained a con-
   veyance by fraudulent means or under circumstances rendering
   it necessary to impress a constructive trust to grant relief,
   since such statutory provisions are designed to prevent fraud
   and not to operate as a cloak therefor (3 Comp. Laws 1929,
   § 13411).

6. Trusts—Constructive Trust.

A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other.

Appeal from Alger; Runnels (Herbert W.), J. Submitted October 14, 1947. (Docket No. 66, Calendar No. 43,859.) Decided January 5, 1948.

Bill by Lyle Digby and wife against Julius Thorson and another to compel conveyance of real estate. Cross bill by defendant Thorson against plaintiffs for decree determining that plaintiffs have no interest in the land. Decree for defendant. Plaintiffs appeal. Reversed and decree entered for plaintiffs.

*Glenn W. Jackson,* for plaintiffs.

*George S. Baldwin,* for defendant.

Boyles, J. Plaintiffs, husband and wife, filed the bill of complaint in this case to compel the defendant Julius Thorson to convey to them certain property fronting on Lake Au Train in Alger county, claiming that Thorson held the same as a trustee under a constructive trust for their use and benefit. The Peoples State Bank of Munising was joined as defendant for the reason that it holds a mortgage on the property. However, the rights of the bank as mortgagee are not an issue in the case. From a decree dismissing their bill of complaint and granting defendant Thorson certain incidental relief on a cross bill, the plaintiffs appeal. We review the record *de novo.*

For several years prior to April 10, 1945, one Alan B. McGregor, a resident of Detroit, was the owner of lots 2 and 3, section 7, town 46 north, range 20 west,

excepting the south 500 feet of lot 3, on Lake Au Train in Alger county. On a part of the property were several buildings—a clubhouse, a "studio," several lodges and cottages and other buildings, known as the Bar M Camp. In November, 1943, McGregor in writing appointed plaintiffs as managers of the property for a 5-year term unless terminated on 30 days' notice in the event of a sale of the property. The writing provided:

"If and when any portion of this property is to be sold, the Digbys (plaintiffs) will have the right to buy in preference to any other parties."

Under this agreement the plaintiffs continued in possession, using the clubhouse for resort purposes, renting rooms and boats to tourists, fishermen and hunters. Plaintiffs received $25 per month from McGregor for caretaker services. Lyle Digby made improvements—built steps and approach to the studio, cleared out old stumps and trees, built steps and a dock down at the water, cleared lake bottom for swimming, built shelves, repaired eaves troughs and screen windows, painted doors and windows, removed brush, removed outhouses and built new ones, salvaged old lumber, tore down an old shed and repaired and improved the main house, leveled the tank house, renewed ten doors at the main lodge, repaired deep-well pumps, insulated doors and windows, did some electrical work, kept the road in shape, built a building over the deep-well pump, built a cesspool, built a pump house, and otherwise improved the property with the view of ultimately becoming the owner.

Defendant Thorson lived near Munising and was in the real estate business. He had known plaintiffs for about 20 years, had something to do with their getting the job from McGregor as caretakers. Mrs.

Digby testified that after they had started living on the Bar M property Mr. Thorson came to their place two or three times a week on friendly visits; that in the winter of 1945 he talked to them of purchasing the Bar M, and that they (plaintiffs) should have where the buildings were and a certain amount of frontage and he was to give them all the time they wanted to pay for it. He asked her to contact McGregor about purchasing the entire property. She testified that she called Mr. McGregor long distance, that he came up to the Bar M, that Mr. Thorson came also about the first part of April or latter part of March, 1945, and that Mr. McGregor said he would have to get the papers from his office before he could give them a price. Three or four days before April 10th, Mr. McGregor had his reports back from Detroit and fixed the price at $12,700, including everything. She testified it was then talked that plaintiffs were to get the Bar M land, buildings and furniture, that no price was fixed at that time as to how much they were to pay, that later they met at Attorney Nebel's office in Munising, with Mr. Thorson, Mr. McGregor and some others. She testified:

"In Nebel's office, well it was talked that I was to get the buildings and furnishings and boats, everything that was out there, without about 200 feet on each side and all cottages, at a price of about $7,000. At that time Mr. Nebel wanted to draw my papers up. He mentioned it. 'Why not draw your papers now.' I said 'Yes, we knew each other so many years.'

"*Q.* What did Mr. Thorson say when you made that remark?

"*A.* That I was not afraid of him, that I was not worrying.

"*Q.* That you were not afraid of Mr. Thorson?

"*A.* Yes.

"*Q.* Wasn't that mentioned more than once about drawing the papers?

"*A.* Yes, Mr. Nebel mentioned it a couple of times.

"*Q.* You had known Mr. Thorson a good many years?

"*A.* Yes, sir.

"*Q.* Did you then have confidence in him?

"*A.* Yes, sir."

At that time (April 10, 1945) a deed was executed whereby McGregor deeded the entire property to Thorson and gave him a bill of sale of the personal property, for $12,700. Mrs. Digby testified that after leaving the office they went back to the Bar M and while she was preparing a meal, Mr. McGregor, Mr. Thorson and Mr. Digby and others talked about the property at which time Mr. McGregor said he wanted Mr. Digby to have the Bar M, Mr. Thorson said $7,000 would be the price, they talked about the lake frontage which was to be 200 feet on both sides of the cabins. She testified:

"After this I had some talk with Mr. Thorson, probably about in May. 'Well, I asked him if we should not draw up some papers, some agreement, so we should know where we were at and then he told me he could not let me have it then for $7,000, but wanted $8,000.'

"*Q.* Was that in May?

"*A.* Either in April or May, I am not positive on the date.

"*Q.* Did you give Mr. Thorson any money?

"*A.* Yes, I did."

Plaintiffs' exhibit 4 was received in evidence, as follows:

"June 6—1945.

"Received from June Digby $800 Eight Hundred Dollars to apply on option of Bar M buildings and land.

"JULIUS THORSON."

Mrs. Digby testified to several later conversations with Mr. Thorson regarding making out the papers for the property. Exhibit 5 was received in evidence, as follows:

"August 8, 1945.

"I hereby agree to sell Camp Bar M—property with all Bldg—thereon and personal property as agreed here before for the consideration of $8,437.

"The above property is located on Au Train Lake, Alger Co. The consideration herein includes the timber cut thereon in question. Interest on contract .7% to be executed Aug. 9, 1945 from date.

"JULIUS THORSON."

Concerning the above exhibit, Mrs. Digby testified as follows:

"Mr. Gillan handed this paper to me in John Tervo's. Mr. Gillan and Mr. Thorson were talking. I didn't hear very much of the conversation between them. I didn't pay much attention, but then later on Mr. Gillan handed me this paper. Several times before this I came in town looking for Mr. Thorson to get the papers. I asked him if we should not make out the papers. This was both before and after this paper, exhibit 5. He said first he was waiting until the deed came back and then he could not get a surveyor. It would be hard to say how many times I talked with him, possibly seven or eight times. I wrote him a letter. I asked him for a certain date and he did not appear. I asked him to meet me at a certain time and he was not there. * * *

"I talked to Thorson in November before hunting season. Mr. Thorson came out and he had another

gentleman with him. I don't know who the other gentleman was. He was a stranger to me. They had been looking over some lots. I said, 'Well, when am I going to get my papers.' He said, 'I can't get a surveyor. This man, if he buys, he will not have a surveyor either. He will have to take my word.'

"*Q.* Well did he ask you to produce or pay any more money or anything?

"*A.* Yes, then he wanted me to pay some more money.

"*Q.* How much money?

"*A.* He wanted me to pay it all.

"*Q.* How much?

"*A.* That would be $6,200.

"*Q.* $6,200?

"*A.* He didn't say. He said he wanted the money. I need the money.

"*Q.* When you first talked about getting this place was there anything said about when the money should be paid?

"*A.* No. Mr. Thorson said he would give us all the time we wanted to pay for it. He referred to Mr. Chaffee, all the years he trusted him."

Plaintiff Lyle Digby testified as follows:

"I remember when Mr. McGregor and Mr. Thorson came to my place. The association was friendly. Thorson said that he would take it over and turn our part over to us at $7,000. There were present at that time Ed. Hanson and his wife and Skaug and his wife, Mr. McGregor and a Miss, I cannot think of her name, Julius Thorson and my wife. This conversation was before they went down to Mr. Nebel's office. * * * We were to pay $7,000 for our share, for 800 feet, 200 feet on either side of the outside of the south building and 200 feet outside of the north building.

"*Q.* Was there anything said in the conversation about the $7,000 to Mr. Thorson?

"*A*. We could have all the time we wanted. * * * In addition to the real estate there was to be included all our personal belongings. We considered that everything in there was ours. * * * Mr. McGregor and Mr. Thorson were out to our place after they had gone to Mr. Nebel's office. At that time there was almost the same conversation that was on this deal of ours in between there.

"*Q*. Well, tell us what was said? * * *

"*A*. Well, that we were to get this place for $7,000, this 800 feet, for $7,000, unless you want me to go into details.

"*The Court:* What was said and who said it?

"*A*. On one occasion Mr. McGregor, Mr. Thorson, Ed. Hanson and Mr. Skaug was sitting in there and I turned to Ed and I said to him that we were to get this property for $7,000 and 800 feet frontage. Besides them I do not know just who was present. Mr. Thorson, Mr. McGregor and Ed. Hanson and Mr. Skaug and my wife and the women were in the kitchen or some place else in the house.

"*Q*. Did Mr. Thorson make any objections or say anything about it?

"*A*. No, that was his offer."

Edward Hanson testified as follows:

"I live in Gladstone, and am a woods worker and I know Mr. and Mrs. Digby, Mr. Thorson and Mr. McGregor. I remember being at the home of the Digbys when these people were there and Mr. Skaug was there. Mr. Skaug was up there on a deal concerning some timber. I heard some talk regarding a deal between the Digbys, Mr. Thorson and Mr. McGregor. I don't remember all that was said. I remember they were to have the cabins and the Bar M, the Digbys. Mr. McGregor said he wanted the Digbys to have the Bar M buildings. Mr. Digby said the extent of the land would be about 200 feet beyond the buildings. Mr. McGregor said he wanted

200 feet on either side of the cabins, as he expressed it. I did not hear it said between Mr. Thorson and Mr. McGregor or Mrs. Mr. Digby told me. Digby told me in front of Mr. Thorson and Mr. McGregor they would have the buildings for $7,000. * * *

"I heard the controversy Mr. McGregor and Mr. Thorson had, over that deal, whereby McGregor was selling all this property to Mr. Thorson. I didn't hear how much Mr. Thorson was to pay Mr. McGregor. I heard about the $7,000. I knew McGregor owned the property and that Mrs. Digby was supposed to pay $7,000 to Thorson."

Attorney Nebel testified regarding what occurred at his office in Munising on April 10, 1945:

"On the date of this transaction Mr. McGregor, Major Lewis, Mrs. Digby and Mr. Julius Thorson came to my office. I am not sure whether Mr. Digby was there, or not. Mrs. Digby did most of the talking. They came in, I believe, together, and Mrs. Digby said, 'We are buying the Club from Al.' That would be Alan McGregor, and he was to give a deed for $12,700 and we are to get the improved property for $7,000. We are going to get space on both sides. We are interested only in the Club property. They were to get approximately 800 feet. It had not been measured out. They did not know where the lines were, but the same would afterwards be run out, so that Mr. McGregor knew where he was at. He was to make a survey, so that Mr. McGregor would know where the lines were and there was approximately 200 feet on both sides, making 800 feet altogether and that the estimated price that the Digbys were to pay were announced by Mrs. Digby when she came in.

"Q. What was said about making out a deed to it?

"A. I said, I suggested that phase of it, that they put it in writing. That was turned down because they said they would wait until Mr. Thorson got the deed.

"*Q.* I mean about making out the deed to Mr. Thorson, who said anything about making out the deed to Mr. Thorson?

"*A.* Mrs. Digby.

"*Q.* Was Mr. Thorson there?

"*A.* Oh yes, we were all there except I don't know whether Mr. Digby was there. I can't place him in the picture.

"*Q.* They suggested making out some papers between Mr. Thorson and Mr. McGregor?

"*A.* Yes.

"*Q.* Tell us what happened?

"*A.* That was, they didn't want the papers made out then.

"*The Court:* Who is they?

"*A.* Well, all the parties there. I made that suggestion twice and the second time I made the suggestion Mrs. Digby said, well all we are getting, we are interested in the clubhouse and Mr. Thorson is in the real estate business and he gets the rest of it and we get this resort business, but we are not interested in that part of it so—

"*Q.* Did Mr. Thorson do any talking there?

"*A.* Well, just in the way of they were all there in the office. I don't remember Mr. Thorson saying anything in particular except that that was agreeable, the items, and I drew the papers, * * *

"*Q.* Do you recall whether or not there was anything said about the personal property that day outside of the automobile?

"*A.* Yes, there was.

"*Q.* What was said?

"*A.* There was a bill of sale, I believe, given covering personal property of Mr. McGregor made out to Mr. Thorson.

"*Q.* Did you make that out?

"*A.* We did.

"*Q.* And was there anything said about the personal property with reference to the Digbys?

"*A.* Well the Digbys were to have everything in connection with that business of running the Club,

that is the resort business, and have approximately 200 feet on both sides there as stated by Mrs. Digby there when she came in the office. That was in the presence of the parties to this transaction.    *    *    *

"Defendants' exhibit A is a bill of sale. I drew it from McGregor to Thorson, under date of April 10, 1946 (1945). That was the date when the deeds were drawn. It was the personal property he was selling, all the personal property in this transaction, all the personal property was included from McGregor to Mr. Thorson and the $7,000 was to take this over. The personal property down in the Club was to go to Mrs. Digby. I think it was. Everything in the line of personal property went in the sale from McGregor to Thorson."

If anything further should be considered necessary to show that defendant Julius Thorson was purchasing that part of the Bar M Camp property claimed by plaintiffs for their use and benefit, to be turned over to them for $7,000, it is found in the testimony of Thorson himself. He testified:

"In regard to this deal on the Bar M property and my buying the property from Mr. McGregor, I can't remember for sure, he mentioned it first or whether it was Mr. McGregor or Digby, but then he mentioned the purchasing of the rest of the property.    *    *    *    I had some conversation with the Digbys in the presence of Mr. McGregor. There was a lot of conversation. The price was first mentioned at around $12,000 by Mr. McGregor at the Bar M.  ·He had to get some figures from Detroit before he could say just what the price was. It was a few days before we went up to Mr. Nebel's office. I had some conversation with Mrs. Digby with reference to the portion they wanted. She wanted those buildings up there. It was barely the north wall of the studio and the south wall of the lodge and a strip of land a few feet wide from the lake to the road. That was all she wanted. I talked in terms of purchase with her but not with him. She

did not want him to know anything about the deal. My conversation with her was that I should buy the place and sell that back to her and she said she could get the money any time that she wanted.

"*Q.* How much money was it to be?

"*A.* $7,500. If it could be bought for $12,000 plus any expense I went to. There was talk of financing it and the Digbys didn't tell me anything about buying it direct from Mr. McGregor. Mrs. Digby said she had $3,000 in Detroit that she would get shortly for the down payment.

"*Q.* Was there any talk about the rest of the terms of the purchase?

"*A.* Only that I told her that I thought for $3,000 she could handle the deal. If I couldn't take it I thought the bank would take it.

"*Q.* Was that substantially the arrangement of the last meeting before you went to Nebel's office?

"*A.* That's right.

"*Q.* Then later, you tell us what occurred between that and going up to Mr. Nebel's office and what occurred at Mr. Nebel's office?

"*A.* I mentioned that on the street before they went up to Mr. Nebel's office, Mrs. Digby, the officer and Mr. McGregor. * * * I talked with the Digbys about the interest rate on their transaction, it was seven per cent. In Mr. Nebel's office Mrs. Digby mentioned that she was buying the part with the buildings on.

"*Q.* Did she mention the extremities of the purchase?

"*A.* That was never mentioned before anyone, but her and I never.

"*Q.* What was said with reference to the price up there, if anything?

"*A.* There was nothing said about the price.

"*Q.* What was said of the memo, if anything, or the contract?

"*A.* We said we would take care of it later. * * * I went to the Bar M that evening or that afternoon. I don't remember whether the others

were there or not. I was there so many times I can't remember. The Digby deal was never discussed in price but it was known they were to buy it. I remember receiving some money on June 6, 1945. I got in touch with Digby between the deal up in Mr. Nebel's office and June 6th, several times, trying to get it closed up. I asked them when they would be ready to make the payments, so they could get the deal closed. They said they would do it in a short time, that they could get part of the money, or all of it, from friends. She said she had $3,000 in Detroit. I didn't talk with him so much as with her. Quite a few times I was in there, quite often. In John Tervo's bar, Mr. and Mrs. Digby was there. She said she had some money she wanted to give me and I asked her how much and she said $800. She said she had it lying around the house and she didn't want it to lay there and she wanted to make a payment on Bar M.

"*Q.* Was there anything further said by you, or her?

"*A.* Yes it was mentioned about the rest of the money so it was closed and she would have it shortly and she had this money and wanted to get rid of it. I accepted the money after some talk. I didn't like to accept that small amount. *  *  *

"At the time I made the deal with the plaintiffs, it was that it would take in all of the buildings, that is, about 380 feet. I had a talk with Mrs. Digby and she wanted just up to the walls of the buildings. It developed later, which I did not know, and I guess they didn't know, when you drive, it looks straight, but strictly the road was at an angle. We discovered it would run off their property. I thought I would remedy that in the deed, so that they would have access to the road. If they put the road in straight, it would be quite an expense. There is a deep ravine there, but that was agreeable to the Digbys. My dealings were entirely with Mrs. Digby. As far as the land running south of the south building and

north of the north building, it came up later and I
agreed to give a little more frontage, just a few feet.
The exact frontage was not mentioned. I authorized
Mr. Baldwin to name a frontage of 10 feet outside
each building, the studio and the lodge. * * * I
was selling the buildings with the contents and a
piece of land. It stated the width of the buildings
from the highway to the road. They were taking all
of the personal property except the timber. That
was out."

Plaintiffs make no claim that the written mem-
oranda are sufficient to satisfy the requirements of
the statute of frauds.* Their sole claim is that un-
der the circumstances defendant Thorson purchased
that part of the Bar M Camp property consisting of
the so-called clubhouse and certain cottages and
other buildings and including the land between a
line running 200 feet south and a line running 200
feet north of the buildings, for their use and benefit
under an understanding that he was acquiring it for
them. While there is some discrepancy in the testi-
mony as to the price to be paid, there is no question
but that it was to include the contents of the build-
ings, and that plaintiffs also were to have the per-
sonal property.

Some of the testimony hereinbefore referred to
was contradicted by Mr. Thorson, the only witness
to testify in his behalf on the material issues of fact
involved. The testimony of plaintiffs is corrobo-
rated by that of Attorney Nebel and Mr. Hanson,
as well as being largely admitted by the defendant
himself. The conclusion is inescapable that Thor-
son purchased the entire property from McGregor
with the understanding that the improved resort
property referred to in the bill of complaint was

---

* See 3 Comp. Laws 1929, § 13411 (Stat. Ann. § 26.906).—RE-
PORTER.

being purchased by him for the plaintiffs herein. The testimony preponderates that the price 'to the plaintiffs was to be $7,000 which was to include the personal property. Attorney Nebel and Mr. Hanson testified without qualification to that effect. Nebel also testified that the extent of the plaintiffs' property, including the 380 feet from the north side of the studio cabin to the south side of the clubhouse, was also to include 200 feet north and south of the buildings. According to the plat received in evidence in this case, marked plaintiffs' exhibit 2, this would afford plaintiffs access to the highway and is in accord with Thorson's own testimony that he intended to deed to plaintiffs enough additional land for them to have access to the highway.

It appears from the record that Thorson gave the defendant bank a mortgage on the entire property purchased from McGregor, for $8,000 to obtain part of the purchase price. This mortgage still exists as a lien on the property, including that part involved in the instant case, in so far as shown by the record, and must be considered in the decree entered herein.

We conclude that the defendant Thorson holds that part of said property here involved, in trust for the plaintiffs; that he agreed to purchase it for the plaintiffs for a price, to them, of $7,000, including the personal property thereon, on which purchase price he has received $800; and that he should be required to fulfill the trust.

"Fraud is not necessary to give rise to a constructive trust, but if circumstances are such as to render it inequitable for the holder of the legal title to retain the same, the court may charge it with a trust in favor of the equitable owner. Implied trusts arise by operation of law as contradistinguished from those that arise from agreements

of the parties, and are raised by law for the purpose of carrying out the presumed intent of the parties, or without regard to such intention for the purpose of asserting equitable rights or frustrating fraud. This form of trust is practically unlimited in extent and is employed whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice." *Weir* v. *Union Trust Co.* (syllabus), 188 Mich. 452.

"Constructive trusts arise by operation of law, not by agreement or from intention, and are raised by a court of equity whenever it becomes necessary to prevent a failure of justice. * * *

"The statute of frauds, including its provisions that a trust be created by a written instrument, is not a bar which may be raised in a court of equity by one who has obtained a conveyance by fraudulent means or under circumstances rendering it necessary to impress a constructive trust to grant relief, since such statutory provisions are designed to prevent fraud and not to operate as a cloak therefor (3 Comp. Laws 1929, § 13411)." *Stephenson* v. *Golden* (syllabi), 279 Mich. 710.

"A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other." *Evanoff* v. *Hall* (syllabus), 310 Mich. 487.

See, also, *Gulf Refining Co.* v. *Perry,* 303 Mich. 487; *Koenig* v. *Koenig,* 311 Mich. 12.

A decree may be entered in this Court determining that the defendant Julius Thorson holds that part of said lot 2, section 7, town 46 north, range 20 west, Alger county, Michigan, lying between a line east and west 200 feet north of the north line of the studio-cabin and a line east and west 200 feet south of the south line of the clubhouse on said property,

in trust for the plaintiffs herein, Lyle Digby and June Digby; said description being the same as shown on the plat, plaintiffs' exhibit 2 received in evidence in this case; said decree will provide that the defendant Julius Thorson convey the same to said plaintiffs free and clear of all liens and encumbrances thereon upon payment or tender to him of the sum of $6,200, within 90 days from the date of entry of said decree; that in the event that said parcel of land shall not be released from the mortgage encumbrance held by the bank without payment of the aforesaid sum of $6,200 to said bank, the same may be paid to the bank within said 90 days to obtain such release instead of being paid or tendered to the defendant Thorson; that upon payment as aforesaid the defendant Julius Thorson shall forthwith convey the above-described land to the plaintiffs herein, and in case of failure or refusal to do so the decree may be recorded in lieu thereof and for all purposes be considered the same as a conveyance thereof; that said defendant Julius Thorson, upon the aforesaid payment, shall also transfer to said plaintiffs title and ownership of the personal property on said land, and that plaintiffs in case of the failure to make such transfer shall be considered as the owners thereof. The decree will further provide that the case be remanded to the circuit court for such further hearing and determination as may be necessary to an adjudication of the rights and duties of the defendant bank as mortgagee and the other parties herein regarding the mortgage lien on the aforesaid trust property. The decree will further provide that if said plaintiffs shall neglect or fail to exercise the rights decreed to them in said decree during the period of 90 days from the date of entry thereof, said rights shall be terminated thereby, and thereafter the decree entered in the circuit court shall be considered

in full force and effect.   Costs of both courts to appellants.

BUSHNELL, C. J., and SHARPE, REID, NORTH, DETH-MERS, BUTZEL, and CARR, JJ., concurred.