369 F.2d 811
 George W. BUTLER, Plaintiff-Appellant,
v.
James W. ATTWOOD and Warren Russell Attwood, Co-executors of
the Estate of Charles W. Attwood, deceased, George J.
Finzel, George J. O. Finzel, Adam E. Finzel, Shirley A.
Finzel, Johanna W. Finzel, Ruth M. Finzel, Leile Finzel and
Unistrut Corporation, defendants-Appellees.
George W. BUTLER, Plaintiff-Cross-Appellee,
v.
James W. ATTWOOD and Warren Russel Attwood, Co-executors of
the Estate of Charles W. Attwood, deceased, and
Unistrut Corporation, defendants-Cross-Appellants.
 Nos. 16763, 16808.
 United States Court of Appeals Sixth Circuit.
 Dec. 12, 1966.
 
 Charles J. O'Laughlin, Chicago, Ill., and John Feikens, Detroit, Mich., for George W. Butler. Feikens, Dice, Sweeney & Sullivan, Joseph Levin, Detroit, Mich., on the brief, Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel.
 Roscoe O. Bonisteel, Ann Arbor, Mich., and George E. Bushnell, Jr., Detroit, Mich., for James W. Attwood and others. Roscoe O. Bonisteel, Jr., Ann Arbor, Mich., on the brief, Miller, Canfield, Paddock & Stone, Detroit, Mich., of counsel.
 Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.
 O'SULLIVAN, Circuit Judge.
 
 
 1
 Plaintiff-appellant, George W. Butler, sought a decree requiring defendant Charles W. Attwood[1] and the several defendants Finzel to transfer to Butler one half of those shares of stock of a Michigan corporation, Unistrut Corporation, which had become the subject of a buy-and-sell agreement between Attwood and the Finzels. Right to such relief was bottomed upon a claim that an antecedent contract between Butler and Attwood entitled Butler to purchase one-half of any stock in the corporation which became available for purchase by Attwood. Butler offered, with proper tender, to purchase one-half of the 34,000 shares covered by the Attwood-Finzel contract at the contract price of $12.50 per share. The District Judge in the United States District Court for the Eastern District of Michigan, Southern Division, sustained plaintiff's claim that Attwood's refusal to accord Butler the right to purchase such shares breached the earlier agreement between Butler and Attwood. He held that Butler was entitled to specific performance against the defendants Attwood, but denied such relief as to defendants Finzel because of his holding that 'Attwood did not enter into the (Attwood-Finzel) contract as an agent or fiduciary of Butler.' The complaint was dismissed as to the Finzels. Butler appeals, arguing that relief against the Attwoods alone is worthless to him inasmuch as defendants Attwood and Finzel have failed to consummate the sale of the involved shares to the Attwoods and assert that it has been mutually abandoned.[2] Butler claims that equity can and should grant relief against the Finzels as well as the Attwoods. Defendants Attwood's cross-appeal asks reversal of the judgment against them on the asserted ground that, contrary to the District Judge's holding, the Attwoods' refusal to allow Butler to share in the purchase of the Finzel stock did not breach any contractual duty owed to Butler. This is a diversity action, Michigan law controlling substantive rights.
 
 
 2
 George W. Butler, plaintiff-appellant, a citizen of Illinois, Charles W. Attwood, defendant-appellees' decedent, and appellee George J. O. Finzel, were, prior and subsequent to December 5, 1944, substantial owners of shares of the capital stock of the Unistrut Corporation, a fabricator of a metal framing system. These men were all directors of Unistrut and participated in its operation during the times here involved. Until his death, Attwood was president and the chief executive officer of the corporation; Butler and a corporation owned by him were its sales representatives; and Finzel was the company's treasurer.
 
 
 3
 Shortly before December 5, 1944, Butler, Attwood and Finzel attended a Unistrut directors' meeting where it was disclosed that brothers by the name of Henderson desired to sell their holdings of 36,091 shares of Unistrut. Butler raised the money to buy this stock, and on December 5, 1944, he and Attwood went to the Hendersons and paid the purchase price, Butler acquiring the Henderson shares. Returning from this visit to the Hendersons, Attwood remarked to Butler that acquisition of the Henderson shares would give Butler 'the controlling stock of the company' and then stated: 'you ought to agree to sell me enough stock out of this block that you have just purchased * * * so that you and I will hold identically the same number of shares.' Butler acquiesced, and at his office Attwood wrote out the agreement (Exhibit D) which is the basis of this lawsuit. It was signed by Attwood and Butler and, in Attwood's handwriting, is in words and figures as follows:
 
 
 4
 'Dec. 5-1944.
 
 
 5
 'Agreement is made this date between Geo W Butler & Chas W attwood that the stock purchased from James F. Henderson and Wm A. Henderson by Geo W. Butler amounting to the following shares of Unistrut Corp. stock:--
 
 James Henderson 18822 shares
 
 6
 Wm Henderson 17269 "
 
 
 
 Total 36091 shares
 shall be divided between the two aforesaid parties as follows:--
 Geo W Butler 28130 shares
 Chas W Atwood 7961 "
 
 
 
 7
 Total 36091 "
 
 
 8
 and that any future purchases of stock shall be made on a 50-50 basis between the two parties and that at some future time an agreement for coverage of all contingencies will be drawn between the parties.
 
 
 9
 'Signed-- Chas W. Attwood Geo W. Butler.'
 
 
 10
 Thereupon 7,961 of the 36,091 shares acquired from the Hendersons were transferred from Butler to Attwood at the price wich Butler had paid for them. Butler took Attwood's note for the price 'to the paid off as he (Attwood) could.' At the end of this transaction, the share holdings of Attwood and Butler, with shares held by their respective wives, were Butler, 42,085 and Attwood, 42,085, out of a then outstanding total issue of 100,000 shares.
 
 
 11
 From the foregoing beginning and until the making of the Attwood-Finzel contract on March 13, 1964, Attwood and Butler, with a few insubstantial exceptions hereinafter noted, fulfilled their 1944 agreement by advising each other of opportunities to acquire blocks of Unistrut stock and purchasing the same on a '50-50 basis,' including additional shares issued by the corporation. In these acquisitions Attwood and Butler were mutually accorded the privilege of vesting parts of the acquisitions in members of their families and in the case of Butler, in a corporation owned by himself and his wife, which acted as the then exclusive sales agency of Unistrut products. These acquisitions were substantial and, as the price of the stock was going up, at substantial prices. By the time of the Attwood-Finzel contract of 1964, the shareholdings of the Butler and Attwood 'groups' were Butler, 157,622 and Attwood, 159,136 shares.
 
 
 12
 The above slight disparity and departure from a strict '50-50' ownership by the parties came about through separate acquisitions of a few odd lot shares by the Attwood and Butler groups at different times and under special circumstances. Appellees Attwood and Finzel, however, now assert that these separate acquisitions demonstrate that the 1944 '50-50' contract was not considered a binding agreement by the parties, had been mutually abandoned, or so breached as to now forbid equitable relief to Butler. The District Judge considered that these odd lot acquisitions did not support such contentions and, without detailing the evidence of the circumstances involved, we agree with the District Judge. Parts of his findings which we quote below portray the District Judge's view in this regard.
 
 
 13
 We proceed then to consider such of the remaining contentions of the appeal and cross-appeal as call for discussion: first, cross-appellants' charge that the December 5, 1944, contract was not a binding, complete and enforceable contract; and, second, appellant's contention that equity required a decree directing the Finzels to complete the sale of the 34,000 shares of Unistrut stock which was the subject of the 1964 buy-and-sell agreement between them and Attwood.
 
 
 14
 1. Was the 50-50 memorandum of 1944 a binding and enforceable contract?
 
 
 15
 In lieu of relevant discussion by us and with the supplementary qualifications which we will discuss hereinafter, we set out the following recitations from the findings and conclusions of the District Judge, Honorable Wade H. McCree, now a member of this Court:
 
 
 16
 '1) The 1944 agreement is an enforceable contract, and although the relevant phrase that 'any future purchases of stock shall be on a 50-50 basis between the two parties' is ambiguous, this ambiguity is not fatal to validity. Courts do not favor the destruction of contracts because of indefiniteness and hold that uncertainty may be resolved by subsequent acts, conduct, declarations or agreements of the parties. Waites v. Miller, 244 Mich. 267 (221 N.W.171) (1928), Band v. Hazel Park Development Co., 337 Mich. 626 (60 N.W.2d 333) (1953). '2) The provision for future contingencies looks to subsequent agreement on details, absent which agreement, the law imposes suppletive terms of cash to be paid within a reasonable time. Duke v. Miller, 355 Mich. 540 543 (94 N.W.2d 819) (1959), Goldberg v. Mitchell, 318 Mich. 281, 285 (28 N.W.2d 118) (Opinion of Butzel, J.) (1947) '4) The evidence shows that the parties interpreted the ambiguous phrase to require one party to communicate the existence of opportunities to purchase stock in the company to the other party who would then be privileged to purchase one-half of the amount offered for sale. This procedure was followed in all but two instances. The first involved the socalled Handyside transaction where Attwood knew of the offering and did not seek to participate possibly because he had no financial capacity since he had not yet repaid the loan made to purchase from Henderson. The second involved the Hannah transaction, July 15, 1958 which involved an insignificant number of shares, the purchase of which did not create any inequality of holding but had a tendency to equalize the existing holdings of the parties. '5) Evidence of the conduct of the parties shows further that the agreement did not require the party discovering the purchase opportunity to acquire the stock with a resale of onehalf the amount to the other party but only to communicate to the other party the opportunity for direct purchase of one-half the amount offered for sale. Such stock could be purchased either directly by such party or by someone designated by him. '6) Evidence of the conduct of the parties shows that the parties meant by 50-50 equality of purchase, the maintenance of an equal ownership of stock by the parties and their designates characterized as the Chicago Group (Butler) and the Wayne Group (Attwood). '7) The evidence further shows that the respective groups included employees, associates, subordinates or family members of the parties. '8) The evidence shows that any stock offered for sale to either Butler or Attwood, irrespective of the source, and whether from a member of the Chicago Group or the Wayne Group, was subject to the 1944 agreement, unless that stock had previously been the subject of a purchase under the terms of the 1944 agreement. '9) Therefore the Finzel offering which is the subject of this lawsuit, represents an opportunity to acquire stock which should have been communicated by Attwood to Butler in order to afford him the opportunity to purchase one-half of the offering. '10) Therefore Attwood's conduct in refusing to afford Butler this opportunity constitutes a breach of the 1944 agreement. '11) The equitable remedy of specific performance is available to Butler since the stock is closely held and is not available on the market and is therefore unique.'
 
 
 17
 The District Judge expressed his view that the agreement that 'any future purchases of stock shall be on a 50-50 basis between the two parties,' is ambiguous. We entertain some doubt as to whether it can be said that this language is unclear, but such doubt in no way impairs our confidence in the validity of the trial judge's conclusion. It could be argued that the clause was without ambiguity. It was the product primarily of Attwood's desire that the holdings of himself and Butler should, by the transaction of December 4, 1944, be made equal and that such equality be continued. This purpose was clearly and completely expressed. The memorandum prepared by Attwood stated 'Agreement is made * * * that any future purchases of stock shall be made on a 50-50 basis between the two parties.' Such language was indeed completely expressive of the basic agreement upon which the minds of the contracting parties had met. Its deficiency, if any, resides in its failure to set out in minutiae the mechanics to be employed when occasion would arise to implement it. But enforcement will not be denied because of missing details. The parties themselves had no difficulty on the several occasions when they abided by and performed their mutual undertaking; there was no uncertainty as to how those transactions were to be carried out. All that was necessary was the acquisition from the seller of the involved stock certificates and the payment of the purchase price. Michigan announced its relevant rule in Waites v. Miller, 244 Mich. 267, 272, 221 N.W. 171, 173 (1928), as follows:
 
 
 18
 'Courts do not favor the destruction of contracts because of indefiniteness and hold that uncertainty may be removed by subsequent acts, conduct, declarations, or agreements of the parties.' and that enforcement will not be denied where, 'The missing details are of a nature which the court may properly fix and settle.' 244 Mich. at 272, 221 N.W. at 173.
 
 
 19
 Appellees Attwood and Finzel argue, however, that a binding agreement did not come into being on December 5, 1944, because of the clause which followed the basic agreement, to wit: 'and that at some future time an agreement for coverage of all contingencies will be drawn between all parties.' We are not impressed that such clause was intended or could be read as qualifying or rendering conditional the clear, basic and mutual understanding that 'any future purchases of stock shall be on a 50-50 basis.' The use of the word 'contingencies' was in no way indicative that the parties considered that they had failed to agree upon any term essential to a present contract. An uncomplicated definition of a 'contingency' and one that fits here is 'something that may or may not happen.' Webster's Third New International Dictionary, 493. Commissioner of Corporations and Taxation v. Bullard, 313 Mass. 72, 77, 46 N.E.2d 557, 561, 146 A.L.R. 772, 779 (1943). Giving that meaning to 'contingencies' we cannot view the clause in which it was employed as detracting from the completeness of the meeting of the minds of the parties or as imposing a condition on the binding force of the basic agreement.
 
 
 20
 Even if we regard the contingency clause as leaving undefined the mechanical details for preformance, that does not except this case from the general powers of equity to provide means of carrying out a basic contract where there has been a failure to agree upon some non-essential term. Cf. Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513 (1959); City of Los Angeles v. Superior Court, 51 Cal.2d 423, 433, 333 P.2d 745, 750 (1959). We think that language of Professor Corbin is peculiarly apt in the context of this lawsuit; he says:
 
 
 21
 'Even though certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement.' 1 Corbin on Contracts, Sec. 29, p. 89, 90 (1963). And again: 'The Court will be more ready to find that the apparently incomplete agreement was in fact complete and required the payment and acceptance of a 'reasonable' price or a performance on 'reasonable terms' in case the parties have already (as in this case) rendered some substantial performance or have taken other material action upon their existing expressions of agreement.' 1 Corbin on Contracts, Sec. 29, p. 93 (1963), citing Morris v. Ballard, 56 App.D.C. 383, 16 F.2d 175 (1926), 49 A.L.R. 1461.
 
 
 22
 Such is the view of the Michigan courts. Waites v. Miller, 244 Mich. 267, 221 N.W. 171 (1962); Band v. Hazel Park Development Co., 337 Mich. 626, 628, 60 N.W.2d 333 (1953). We agree, therefore, with the District Judge that the law 'imposes supplementive terms of cash to be paid within a reasonable time.' Duke v. Miller, 355 Mich. 540, 543, 94 N.W.2d 819, 820 (1959); Goldberg v. Mitchell, 318 Mich. 281, 285, 28 N.W.2d 118 (1947). And we look upon his opinion as a fully supportive finding of fact that the parties here did not consider that any essential term was missing from the contract of December 5, 1944.
 
 
 23
 Attwood and Finzel finally cupport their claim that no agreement was accomplished by the memorandum of December 5, 1944, by referring to the fact that in 1944 and again in 1948 Butler proposed to Attwood that they enter into an agreement whereby in the future neither would sell any of his then holdings of Unistrut without first offering such shares to the other. Attwood declined to execute such contract. We do not look upon the foregoing as a failure of the parties to agree upon something that was in their minds when they made the contract in suit-- there is no evidence that the making of such agreement was requisite to the binding force of the original contract, and it was in no sense a means of or necessary to performance thereof. The parties' own consistent obedience to the basic '50-50' contract after Attwood's rejection of Butler's two buy-and-sell proposals clearly portrays their awareness that Attwood rejection did not impair their original mutual undertaking.
 
 
 24
 We affirm the District Judge's holding that the December 5, 1944, memorandum created a binding contract, that defendant Attwood's 1964 contract with Finzel, coupled with his refusal to offer one-half of the Finzel shares to Butler, was a breach of the 1944 contract and that Butler is entitled to specific performance of such contract.
 
 
 25
 2. Can equity enforce consummation of the 1964 Attwood-Finzel contract?
 
 
 26
 The District Judge was of the view that since Finzel was not a party to the 1944 contract between Butler and Attwood, and 'since Attwood did not enter into the contract (the 1964 Attwood-Finzel contract) as an agent or fiduciary of Butler, Finzel is not subject ot the order of the court for specific performance.' In view of his finding that the substantial equities were all on the side of Butler, we are satisfied that the denial of specific preformance against Finzel was not an exercise of discretion or merely a withholding of equity's grace, but instead a conclusion that, as a matter of law, equity was powerless to bring Finzel within the reach of its decree. The chancellor, we decide, underestimated his authority.
 
 
 27
 The decree as entered merely provided that if Attwood should acquire any of Finzel's shares under the 1964 agreement or otherwise, he would have to afford Butler an opportunity to purchase half of them. In view of the claim of appellees, Attwood and Finzel, that the 1964 contract was mutually abandoned,[3] the decree as entered was an empty victory for Butler. Defendants Finzel offered no evidence and made no claim that they would be prejudiced by being required to perform their agreement with Attwood. Consummation of the sale would divest the Finzels of all ownership interest in Unistrut, and George J. O. Finzel who, with his wife, was the owner of 31,000 of the total 34,000 shares agreed to be sold to Attwood, testified that he had intended that, following completion of the sale, he would take at least a six months leave of absence and then retire from his long-held position as an executive of Unistrut. He testified that he had altered his position in such regard since the litigation started. Asked whether he knew of Attwood's agreement with Butler, he answered that he first 'became aware of this so-called written agreement' after he had made his deal with Attwood, but conceded that he 'had heard there was some agreement.' We are satisfied that the Finzels' willingness to abandon the 1964 agreement and their vigorous resistance to the relief here sought by plaintiff, evidences a purpose to assist a breach of the Butler-Attwood contract.[4] It is not claimed that the Finzels would not have made their deal with Attwood had they been aware that Butler would acquire one-half of the shares they were selling. Their agreement with Attwood contained no limitation on his right of resale and indeed they expressly agreed to sell to Attwood or to 'his nominee or nominees.' Appellees' brief refers to the AttwoodFinzel contract as providing 'for the possible purchase' by Attwood and on oral argument counsel talked of it being an 'option.' It was, rather, a binding agreement covering all details of performance, and at the commencement of the lawsuit Attwood had paid the required down payment of $10,000 and the Finzels had, in turn, endorsed in blank their shares of stock and delivered them to the National Bank of Detroit to be there held in escrow until the balance of the purchase price, $415,000, was paid. Prior to the date when such balance was due, this suit was commenced by Butler with tender to Attwood of the amount of the down payment and tender to the bank of the entire balance of the purchase price against delivery to Butler, at the option of Attwood and Finzel, of all or any part (not less than half) of the shares held in escrow. This tender has been kept good and an order of the District Court provides that pending this appeal, the 34,000 shares on deposit with the bank 'shall not be removed from that Branch and their present deliverable state shall not be altered.' The District Court's denominated Order Granting Supersedeas further provided that 'The Finzel defendants will be retained as parties defendant for, and solely for, the purposes of the appeal taken by Plaintiff from a part of the judgment in this action * * *.' Obedience to a decree of specific performance that will include the Finzels con, therefore, be easily accomplished.
 
 
 28
 Plaintiff plants his request for relief first upon the general principle that 'equity considers that done which ought to be done,' and second, that by the Attwood-Finzel contract of 1964, Attwood acquired a vested right to purchase the Finzels' shares and to the extent of one-half of those shares held such right as a constructive trustee for Butler, such shares becoming impressed with a constructive trust of which Butler is a beneficiary. Butler further contends that his beneficial rights could not be and were not destroyed by the claimed mutual abandonment of the Attwood-Finzel contract. We hold that Butler is entitled to the relief sought.
 
 
 29
 In so holding we need not make precise selection of which of the many instruments of equity's power we employ. Certainly under the factual findings of the District Judge, Butler ought to be permitted to have done what was needed to be done to protect his legal and equitable rights, provided of course that rights of others of equal stature will not thereby be impaired. We have pointed out that no rights of the Finzels will be so impaired. Resistance to extending the remedy to the Finzels is made first by claiming that the Butler-Attwood 50-50 contract of 1944 is not enforceable. We have already discussed and found invalid this claim. An alternate position of the Finzels who, in their address to us, do not speak separately from the Attwoods, is that no res came into being upon which a constructive trust could be impressed. We consider that the right of Attwood to acquire and the obligation of the Finzels to sell the involved shares created a res upon which to impose a trust for Butler's benefit.
 
 
 30
 We need not attempt embellishment of the literature of equity by our own expatiation on its high purpose and broad reach. We have repeated the familiar tenet that equity considers that done which ought to be done. Candler v. Donaldson, 272 F.2d 374, 377 (CA 6, 1959). Judge Talbot Smith of the United States District Court of Michigan, and speaking then for the Supreme Court of Michigan as an Associate Justice thereof, in Kent v. Klein, 352 Mich. 652, 91 N.W.2d 11 (1958) well articulated this principle. In that case, Michigan chose a constructive trust as the means of doing equity when a daughter became her mother's grantee to a piece of land which the mother had intended should be held for a mentally deficient son. The daughter had no part in the arrangements which prompted the mother to deed the land to her and refused to carry out the agreement that had been made between the mother and another son in vesting the title in the daughter. She resisted a suit brought to carry out the mother's intention. While the facts of the case do not precisely fit our own, Justice Smith's observations are pertinent here. After repeating the equity rule that 'equity * * * regards that as seen which ought to be seen, and, having so seen, as done that which ought to be done' he spoke of the doctrine of contructive trust as follows:
 
 
 31
 'What is overlooked in all of this is the fact that the constructive trust is not a trust at all, any more than a quasi-contract is a contract. See 4 Scott on the Law of Trusts, 462.1. Both are remedial devices. This constructive trust, as it was put by Mr. Justice Cardozo, 'is the formula through which the conscience of equity finds expression. * * *. " 352 Mich. at 656, 91 N.W.2d at 14.
 
 
 32
 In the case at bar it will conform to equity to hold that to the extent of one-half thereof, Atwood acquired the right to buy Finzel's shares as constructive trustee for Butler and we observe no impediment to employing as a remedial device a decree which will direct the carrying out of the Attwood-Finzel contract, thereby to fulfill the constructive trust. Dealing further with the subject, Justice Smith quoted from Weir v. Union Trust Co., 188 Mich. 452, 463, 154 N.W. 357, 360:
 
 
 33
 'Such trusts (constructive) are also known as trusts ex maleficio or exdelicto, or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.' 352 Mich. at 658, 91 N.W.2d at 14.
 
 
 34
 Such doctrine was reiterated in Digby v. Thorson, 319 Mich. 524, 539, 30 N.W.2d 266, 272 (1948).
 
 
 35
 We are at once aware that after Attwood and the Finzels made their contract on March 13, 1964, and before final consummation, they were, except for equity's intrusion, at liberty to mutually cancel it. Indeed they would be free after a consummation to restore the pre-contract status quo. But we consider that plaintiff Butler at the inception of the binding contract became a beneficiary thereof and his rights as such were placed and remained in the chancellor's hands. Suit was started while the contract was still executory and in force. Equity may identify Attwood in the Attwood-Finzel contract as a trustee for Butler to the extent of one-half of the shares, or consider Butler included in the words 'or his nominee' which followed Attwood's name. We think that the District Judge's finding that 'Attwood did not enter into the contract as * * * fiduciary of Butler' is a conclusion of law inconsistent with his findings of fact.
 
 
 36
 Counsel's and our own research has produced little decisional law fitting nicely into the facts of the case before us. This however, should not forbid our fashioning an effective 'remedial device' if it can be done without offense to the general rules of equity. Pomeroy supports a view that Butler acquired an enforceable interest in the Attwood-Finzel contract; after reciting the principle that equity 'imputes an intention to fulfill an obligation,' the author goes on to say:
 
 
 37
 'The principle is applied in those cases where a court of equity is called upon to determine whether an equitable estate or interest in certain subject matter belongs to A, in pursuance of an obligation which rested upon B, although B, in acquiring the subject matter, has not expressed or indicated in any manner an intention on his part of performing such an obligation; that is, he did not acquire the subject matter for the avowed purpose of fulfilling this duty. 'Notwithstanding the absence of such an avowed intention, a court of equity may proceed upon the presumption that B did intend to perform his duty; may hold that the subject matter was acquired with that design, and that in consequence of such purpose an equitable estate in it belongs to A.' 2 Pomeroy's Equity Jurisprudence, p. 182 (1941)
 
 
 38
 Appellees refer us to no arthority directly or indirectly forbidding the remedial device we order. Appellants cite Opdyke v. Kent Liquor Mart, Inc., 181 A.2d 579 (Del.1962); Veranth v. Moravitz, 205 Minn. 24, 284 N.W. 849 (1939); and Harmer v. Armstrong, 1 Ch. 65 (Court of Appeals of England, 1934), as authority for the proposition that the beneficiary of a constructive trust may assert his rights thereunder against a third party, a stranger to the antecedent arrangement which brought about the trust, but a party to the later contract upon which the trust was imposed. The cited cases generally support such contention, but we content ourselves with discussion of the English case, Harmer v. Armstrong. In that case, three persons, Harmer, King and Armstrong, agreed to attempt purchase of a business owned by Vallancey Press, Ltd. Armstrong was to negotiate for it and succeeded in coming to an agreement of purchase, which he made in his own name. Thereafter, and because of dissatisfaction with the terms of an attempted arrangement between himself and his associates for his employment as manager of the enterprise, Armstrong repudiated the plan to have Harmer and King included in the purchase, and asked Vallancey Press, Ltd. to release him from the contract of purchase. Before such release was accomplished, 'the writ in this action was issued.' (This refers to an action by Harmer and King against Armstrong and Vallancey Press, Ltd., for specific performance of the purchase agreement that Armstrong had made with Vallancey). Shortly thereafter, Vallancey released Armstrong and made a new sale to one Sumner who was then aware of the claims of Harmer and King. Thus, this English case presented the question of whether specific performance could be decreed against a third party, Vallancey Press, Ltd., a stranger to the antecedent contract out of which the plaintiffs' rights arose. As in the case at bar, the trial chancellor found the equities in favor of the plaintiffs, but for various reasons considered that, in the action before him, specific performance could not be decreed against Vallancey or its new purchaser, Sumner.
 
 
 39
 The Court of Appeals reversed, and we quote relevant observations of its judges:
 
 
 40
 'Whenever a party under a contract, at the date when he enters into it is (or thereafter constitutes himself) a trustee for a third party that party has a right conferred upon him by way of property to sue on the contract whether the contract be under seal or not and can, according to well settled principles, enforce that right in equity, joining the trustee as a defendant to the action.' 1 Ch. at 88. 'The learned judge, having heard the evidence, has come to the clear conclusion that there was a trust and that the trustee had committed a breach of trust in not enforcing the contract. In these circumstances, I think that the present case is plainly one in which the Court ought to act on the equitable rule and decree specific performance of the contract.' 1 Ch. at 89.
 
 
 41
 After disposing of a technical question, Lord Hanworth concluded:
 
 
 42
 '* * * we ought to say that in all the circumstances of the case we are prepared, as all the parties are before the court, to give the remedy to which they would ultimately become entitled after greater expenditure and greater delay, namely, specific performance of the contract-- the contract in which the defendant Armstrong will share together with the plaintiffs. 'In those circumstances we shall allow the appeal, discharge the order made as to an enquiry as to damages, declare the rights of the plaintiffs, and make an order for specific performance.' 1 Ch. at 85.
 
 
 43
 This English decision is, of course, not binding on us but we find ourselves in agreement with the practicability of its use of equity's power. In the case at bar, all parties are before the Court, and the shares of stock and the money to pay for them are available, so that the District Judge has all of the materials from which to fashion the needed 'remedial device'. We hold that plaintiff is entitled to enforcement for his benefit of the Attwood-Finzel contract to the extent necessary to specific performance of his 1944 contract with Attwood and that the decree therefor should include the appellees Finzel within its command.
 
 
 44
 We affirm the Judgment of the District Court in all respects except in the dismissal of the Finzels and its denial of specific performance as to them. The cause is remanded to the District Court for further proceedings consistent herewith.
 
 
 
 [1]
 Charles W. Attwood died during the pendency of the cause and James W. Attwood and Warren Russell Attwood, co-executors of his will, were substituted for him as defendants
 
 
 [2]
 Butler did not seek damages against Attwood for breach of contract, presumably because damages could not be adequately measured
 
 
 [3]
 During the pendency of the litigation in the District Court Attwood and the Finzels entered into successive agreements extending the time of performance of their 1964 contract to a date beyond the judgment of the District Judge, but presumably made no extensions thereafter
 
 
 [4]
 Defendants Attwood and Finzel have been represented throughout this litigation by the same counsel, one of whom is and has been a director of Unistrut